UNIBAR MAINTENANCE SERVICES, INC v SAIGH

Docket No. 279774. Submitted March 11, 2009, at Detroit. Decided
    March 19, 2009. Approved for publication May 7, 2009, at 9:00 a.m.

Unibar Maintenance Services, Inc., brought an action in the Oakland
    Circuit Court against Joseph Saigh, Lawrence Wells, and others,
    alleging negligent and innocent misrepresentation, breach of con-
    tract, and actual and constructive fraud with regard to the
    plaintiff's purchase of what it thought was health care coverage for
    its employees. A jury determined that Saigh and Wells (hereafter
    the defendants) were liable for innocent or negligent misrepresen-
    tation and constructive and actual fraud and returned a verdict
    awarding the plaintiff compensatory and exemplary damages. The
    court, John J. McDonald, J., entered a judgment consistent with
    the jury's verdict. The defendants appealed.

The Court of Appeals held:

1. The hypothetical questions that the defendants' counsel
asked the plaintiff's expert during cross-examination were not in
substantial accord with the facts presented at trial and, therefore,
the answers to those questions did not create a legitimate basis
upon which the trial court should have granted the defendants'
motions for a directed verdict and judgment notwithstanding the
verdict.

2. A claim for negligent misrepresentation requires the plain-
tiff to prove that the plaintiff justifiably relied to his or her
detriment on information prepared without reasonable care by a
defendant who owed the plaintiff a duty of care. The evidence
sufficiently established a claim of negligent misrepresentation
because the defendants, through their agent and corporation, held
themselves out to the plaintiff as specialists in health care insur-
ance coverage and the defendants' relationship with the plaintiff
created a duty to proceed under the proper standard of care. The
proper standard of care that the defendants owed the plaintiff
while they were acting as the plaintiff's insurance agents included
determining whether a company is a health insurer licensed to do
business in the state, checking on consumer complaints, knowing
whether the company exists, and determining whether the com-
pany has a history of paying its claims. The defendants failed to

meet that standard of care, in part, by not knowing whether certain of the insurers that they recommended were licensed and by ignoring the fact that certain of those insurers were not paying the claims presented to them. The defendants' argument that the plaintiff failed to show that the defendants owed the plaintiff a duty lacks merit. The plaintiff justifiably relied on the information provided by the defendants. The defendants did not exercise any reasonable care because they recommended to the plaintiff what they represented to be first-dollar-coverage, full coverage health insurance companies that were, in fact, self-funded benefit plans or nonexistent reinsurance coverage. The trial court properly denied the defendants' motions for a directed verdict and judgment notwithstanding the verdict with respect to the claims of negligent and innocent misrepresentation that were pleaded in the alternative.

3. A plaintiff, to sufficiently allege a claim for fraud, must show: that the defendant made a material representation; that the representation was false; that when the defendant made the representation, the defendant knew that it was false, or made it recklessly, without knowledge of its truth as a positive assertion; that the defendant made the representation with the intention that the plaintiff would act upon it; that the plaintiff acted in reliance upon it; and that the plaintiff suffered damage. Here, the defendants' agent made multiple affirmative representations to the plaintiff concerning the nature of the companies that she presented to the plaintiff. The defendants knew that the representations were false at the time that they were made to the plaintiff. Even if the defendants had not known that the representations were false, their actions were reckless because they failed to determine necessary information about the companies in order to meet the applicable standard of care. The defendants made the false and material representations with the intention that the plaintiff act upon them. The plaintiff relied on the representations, because the defendants held themselves out to be specialists in health care coverage, and the plaintiff suffered losses or injury. The great weight of the evidence supported the fraud claim brought by the plaintiff.

4. The plaintiff established a proximate cause of its losses or injury with evidence of the defendants' negligence, misrepresentation, and fraud.

5. The defendants stipulated the admission of all the exhibits at trial and, therefore, cannot argue that some of the exhibits were admitted in error.

6. The defendants failed to show that the jury was exposed to an extraneous influence when the jury foreperson brought into the deliberations charts based on material presented at trial after the court had permitted the jury to take notes.

7. The trial court did not abuse its discretion by denying the defendants' motion for a new trial after it denied the defendants' motions for a directed verdict and judgment notwithstanding the verdict.

8. A corporation may be awarded exemplary damages when appropriate. The injury to the plaintiff's reputation amongst its employees that it suffered as a result of the defendants' actions was not compensable in quantitative terms and, therefore, the award of exemplary damages for the injury was proper.

9. The plaintiff presented sufficient evidence of the defendants' bad faith or ill will and that the defendants acted voluntarily.

10. The defendants waived any argument regarding whether they had notice that the plaintiff was seeking exemplary damages by approving the jury instructions concerning exemplary damages. The defendants waived any argument regarding the sufficiency of the evidence supporting the award of pecuniary damages by stipulating the admission of an exhibit quantifying the plaintiff's damages and failing to object to the testimony presented in support of such damages. The evidence supported the damages awards. The trial court did not err by denying the defendants' motion for remittitur.

Affirmed.

*Hyman Lippitt, P.C.* (by *Douglas Hyman, H. Joel Newman,* and *Daniel J. McCarthy*), for the plaintiff.

*Plunkett Cooney* (by *Robert G. Kamenec*) for the defendants.

Before: DONOFRIO, P.J., and K. F. KELLY and BECKERING, JJ.

PER CURIAM. After a jury trial, Joseph Saigh and Lawrence Wells (hereafter defendants) were found liable for innocent or negligent misrepresentation and constructive and actual fraud. The jury returned a

verdict of $1,282,575 in compensatory and exemplary damages and, subsequently, the trial court entered a judgment against defendants in the same amount. Defendants then moved for a new trial, judgment notwithstanding the verdict (JNOV), and for remittitur. The trial court denied all motions. Defendants now appeal as of right. We affirm.

I. FACTS AND PROCEDURAL HISTORY

Plaintiff is a maintenance and meter-reading contractor, employing approximately 700 employees across numerous states. In 1999, plaintiff retained Benefits USA, Inc. (Benefits), operated by Gregory Cooper, who is a licensed insurance agent, as its insurance agent. In February or March of 2002, Benefits recommended that plaintiff put a segment of its employees on UltraMed, allegedly a full-coverage primary insurance company, and plaintiff enrolled its employees in the plan. Plaintiff was provided with documentation and promotional materials regarding this plan.

Benefits had learned of UltraMed through Kim Thiteca, who is a licensed insurance agent who sold health insurance for Financial Healthcare Systems (FHS) and who recommended UltraMed for plaintiff through Benefits.[1] FHS is run by defendants Saigh and Wells as partners, both of whom are licensed insurance agents in Michigan. Defendants, including Kim, held themselves out as "specialists" in health care insurance coverage. FHS typically sold one plan at a time and would transition into a new plan when the previous plan failed. According to Kim, it was defendants who

---

[1] One of plaintiff's employees testified that Kim made an in-person presentation along with Benefits regarding the UltraMed plan. Kim, however, does not recall if she actually met with plaintiff in person to discuss the UltraMed plan.

"brought" the health care plans into the office for their employees to sell. FHS's employees would prepare presentation booklets and other promotional materials using the of information defendants provided them and these materials would be distributed to other agents. Any insurance agent not employed by FHS who wanted to set their clients up with plans held by FHS had to go "through" FHS. In such instances, both FHS and the external agent would receive commissions.

When Kim recommended UltraMed for plaintiff to Benefits in 2002, Kim knew that plaintiff was seeking major full-coverage primary health care insurance and, despite not knowing whether UltraMed was licensed, did not advise Benefits or plaintiff to perform a "due diligence" or take any special precautions. In addition, one of FHS's service representatives testified that FHS already knew that UltraMed was not paying its claims when plaintiff was placed with it. UltraMed, in fact, was not a health insurance company licensed to operate in Michigan. At the time, UltraMed also had a cease and desist order against it in the state of Florida indicating that defendants had made misrepresentations regarding UltraMed.

Subsequently, the claims of plaintiff's employees under the UltraMed plan began to go unpaid. On March 14, 2002, FHS issued a letter informing plaintiff that UltraMed had gone into receivership and had been ordered to stop selling insurance by the state of Texas. The letter was signed by a customer service representative who received the information from defendants. The letter stated:

> We have looked and found another TPA [third-party administrator] to administer this business. They have agreed to keep your current premiums and Plan Descriptions (excluding the discount Dental and Vision plan) for existing

groups that want to rollover. They also have agreed to retroactive [sic] the effective date to March 1, 2002 provided the appropriate documentation is received. It has been guaranteed that you will not have any lapse of coverage once the signed documentation is received. You will get this information from your agent. The deadline for this rollover is Friday, March 22, 2002.

The new plan recommended to plaintiff was Southern Plan Administrators (SPA). According to Wendy Thiteca, Kim's sister who was a service representative employed by FHS, it was defendants' decision to roll its clients over to SPA.

FHS sent Wendy, who is not a licensed insurance agent, to conduct a due diligence on SPA. During the due diligence Wendy learned that SPA's "reinsurance carrier [was not] on board" and that it was using the premiums it received to pay claims. According to Wendy, the reinsurance carrier was located in Greece and "no one could ever contact [them.]" Defendants were apparently aware of this situation. In other words, SPA was not an actual insurance company; rather, it was an employee health benefit plan that would pay the individual claims and be "backed-up" by reinsurance.

Despite this knowledge, Kim and Benefits made a presentation to plaintiff recommending that plaintiff switch to SPA. Kim presented SPA to plaintiff as a fully insured, first-dollar-coverage, health insurance company and provided a plan description matching UltraMed's. Kim also provided plaintiff with pamphlets and promotional materials, including information about coverage and price quotes. These materials indicated that its customers were satisfied with SPA's coverage. Consequently, in March 2002, plaintiff purchased the SPA plan to replace the UltraMed plan. Under the plan, plaintiff paid SPA $36,000 a month in premiums for the benefit coverage plus an additional 30 percent of each monthly payment to

cover agent fees, commissions, and other administrative costs. SPA, however, was not a health insurance company licensed to operate in Michigan.

On December 12, 2002, Kim sent plaintiff an "urgent" fax requesting plaintiff to fill out a new application for reinsurance with CIC Insurance Company. SPA's reinsurance carrier, Market Trends, had stopped paying claims and SPA decided to switch reinsurance carriers. Kim requested plaintiff to submit another payment, which plaintiff did. CIC, however, also failed to pay any claims and it also was not a licensed insurance company in Michigan. One day later, a cease and desist order was issued against SPA in Texas directing it to stop its operations because of fraudulent practices.

In March 2003, plaintiff began experiencing claims problems. Unbeknownst to plaintiff, SPA had discontinued its operation, but plaintiff continued to make the premium payments. However, when plaintiff could not "get a direct answer out of anybody," it refused to make its July 2003 premium payment. Defendant Saigh and Kim then visited plaintiff in August 2003 in an attempt to resolve the problem. Saigh indicated that if plaintiff made another payment within 24 hours, the claims would be paid. Instead of paying SPA another premium payment, plaintiff, at Saigh's recommendation, signed up with Fleet Care. Soon thereafter, plaintiff discovered that Fleet Care was also not a first-dollar-coverage insurance company. Plaintiff ceased doing business with defendants and switched, with some difficulty, to Aetna Insurance.

As a result of the unpaid claims, plaintiff received "hundreds" of complaints from its employees because their prescriptions were not being covered, collection agents were contacting them, or their doctors refused to

provide any care. In some instances, plaintiff directly paid for its employees' medications and some employees were sued in small claims court by their health care providers. Consequently, "a lot" of plaintiff's employees quit. Further, while plaintiff paid $67,762.55 in premiums to UltraMed and $263,887.15 to SPA, only $124,257 in claims were ever paid.

After discovering this alleged "Ponzi" scheme, plaintiff brought a three-count complaint alleging negligent and innocent misrepresentation, breach of contract, and actual and constructive fraud. The trial court dismissed plaintiff's contract claim on defendants' motion for summary disposition. Plaintiffs then proceeded to trial against defendants Saigh and Wells on the remaining counts.[2]

The trial began on October 17, 2006. Before opening statements, the parties indicated to the trial court that they had stipulated all the trial exhibits. After plaintiff presented its case, defendants moved for a directed verdict. The court denied defendants' motion, determining that reasonable minds could differ. Defendants did not present any witnesses and, after closing arguments, the trial court provided the jury with instructions that the parties stipulated. Subsequently, the jury found defendants guilty of innocent or negligent misrepresentation and actual and constructive fraud, and awarded plaintiff $1,282,575 in compensatory and exemplary damages against defendants jointly and severally. On November 13, 2006, the trial court entered judgment for plaintiff.

After trial, both defendants' counsel and plaintiff's counsel spoke with one of the jurors, Tina Rhines, who

---

[2] The other originally named defendants did not go to trial and are not involved in the appeal, because they were either dismissed, settled with plaintiff, or were not served.

indicated that the jury foreperson had brought two prepared documents into the jury deliberation room. According to Rhines, the foreperson had prepared two chart summaries showing all the participants in the case and a description of their testimony, as well as a time line of events. These summaries were allegedly used to direct deliberation and were relied on heavily during deliberations.

Defendants then filed numerous postjudgment motions, including motions for a new trial, JNOV, and remittitur. The court denied all three of defendants' motions in a written order. This appeal followed.

## II. DIRECTED VERDICT AND JNOV

Defendants first assert that for various reasons none of plaintiff's claims should have been submitted to the jury and the trial court therefore erred by denying defendants' motions for summary disposition,[3] a directed verdict, and JNOV. Consequently, defendants contend they are now entitled to JNOV.

### A. STANDARDS OF REVIEW

We review a trial court's decision on a motion for a directed verdict de novo. *Coates v Bastian Bros, Inc*, 276 Mich App 498, 502; 741 NW2d 539 (2007). We must examine all the evidence, and all legitimate inferences arising therefrom, in the light most favorable to the

---

[3] We consider defendants' contention that the trial court erred by denying summary disposition to be abandoned on appeal. Defendants mention the trial court's denial of summary disposition only in passing. Such cursory treatment does not create a sufficient basis for review. *Blazer Foods, Inc v Restaurant Properties, Inc*, 259 Mich App 241, 251-252; 673 NW2d 805 (2003). Accordingly, we review defendants' arguments as an appeal from the trial court's denial of their motions for a directed verdict and JNOV.

nonmoving party. *Id.* at 502-503. "A directed verdict is appropriate only when no material factual question exists upon which reasonable minds could differ. If reasonable jurors could honestly have reached different conclusions, neither the trial court nor this Court may substitute its judgment for that of the jury." *Moore v Detroit Entertainment, LLC,* 279 Mich App 195, 202; 755 NW2d 686 (2008) (citation and quotation marks omitted).

We also review de novo a trial court's determination on a motion for JNOV. *Morales v State Farm Mut Automobile Ins Co,* 279 Mich App 720, 733; 761 NW2d 454 (2008). "The trial court should grant a JNOV motion only when the evidence and all legitimate inferences viewed in a light most favorable to the nonmoving party fails to establish a claim as a matter of law." *Id.*

### B. EXCULPATORY EVIDENCE

Defendants first argue that they are entitled to judgment because plaintiff's sole expert witness, David Walker, absolved defendants from liability on the basis of his answers to numerous hypothetical questions asked during cross-examination. We disagree. In order to be considered competent evidence, the hypothetical questions, through which testimony is elicited, must be in "substantial accord" with the facts presented at trial. See *Alexander v Covel Mfg Co,* 336 Mich 140, 146; 57 NW2d 324 (1953); *Mapes v Berkowitz,* 304 Mich 278, 279-283; 8 NW2d 65 (1943); *Dudley v Gates,* 124 Mich 440, 445-446; 83 NW 97 (1900).

The line of questioning that defendants rely upon requested Walker to consider whether defendants had done anything wrong assuming that Benefits produced the fraudulent documents instead of defen-

dants and that CIC was an authorized insurance company. Specifically, defendants' counsel asked the following questions:

> *Q.* Okay. Assuming that [the documentation] didn't come from Larry or Joe; they really did come from Greg Cooper; just assuming. . . . [D]o you see anything that would indicate to you that either Joe or Larry made a false statement to Unibar at any time prior to March 2003?
>
>         \*   \*   \*
>
> *A.* No.
>
> *Q.* Okay. Do you see anything to indicate they breached the standard of care [also assuming that defendants didn't make any statements]?
>
> *A.* No.
>
>         \*   \*   \*
>
> *Q.* Okay. Assuming that CIC was authorized to do business in Michigan, did in fact pay claims of Unibar's injured employees . . . through March of 2002, with that information, would that alter your opinion in any way that they were negligent?
>
> *A.* With that hypothetical, yes they would not have done something untoward, as it were, or unethical.

After our review of the record, it is plain that the hypothetical questions, which defendants contend the answers to which absolved them from liability, were not in "substantial accord" with the evidence presented at trial. Plaintiff learned of UltraMed through Cooper. Defendants' agent, Kim, had recommended UltraMed for plaintiff to Cooper. Plaintiff was provided documentation regarding the plan. Subsequently, plaintiff enrolled its employees with SPA, after receiving a letter from FHS, which was produced by defendants, indicating that UltraMed had

stopped operating. The letter indicated that plaintiff could roll over its employees to a new plan that defendants had found and not suffer any loss if it did so within eight days. Thereafter, defendants' agent presented plaintiff with promotional materials regarding SPA, which defendants had selected for the rollover, and plaintiff enrolled in the plan. When SPA stopped paying the claims, defendant Saigh went to plaintiff's office, urging plaintiff to pay the premiums. When plaintiff refused to do so, plaintiff signed up with another insurance company that Saigh had recommended, which also ultimately failed to pay claims.

Thus, absolutely nothing in the record indicates that Benefits and Cooper were responsible for creating the documentation at issue in this matter. Moreover, it was unequivocally established that CIC was not a licensed insurance company in Michigan. Because the hypothetical questions were not in substantial accord with the facts presented at trial, they fail to create a legitimate basis upon which the trial court should have granted defendants' motions for a directed verdict and JNOV.

Defendants next contend that because plaintiff settled its claims against Kim and FHS, plaintiff also released defendants from liability because the release of an agent releases the principal from liability. "Release" is an affirmative defense that a defendant must plead in the first responsive pleading. MCR 2.111(F)(1); MCR 2.111(F)(3). Failure to do so results in a waiver of the defense. MCR 2.111(F)(2). Because defendants failed to raise this affirmative defense in their first response and never moved to amend their response once the claims against Kim and FHS were settled, we consider this argument waived and we voice no opinion on this argument's merits.

### C. INSUFFICIENT PROOF

#### 1. INNOCENT AND NEGLIGENT MISREPRESENTATION

Defendants also contend that plaintiff failed to present a claim of innocent misrepresentation because there was no privity of contract between the parties and because plaintiff did not show that the injuries plaintiff suffered inured to the benefit of defendants. With respect to negligent misrepresentation, defendants argue that plaintiff failed to establish "justifiable reliance" or that defendants owed plaintiff a duty. We disagree.

"A claim of innocent misrepresentation is shown if a party detrimentally relies upon a false representation in such a manner that the injury suffered by that party inures to the benefit of the party who made the representation." *M&D, Inc v McConkey*, 231 Mich App 22, 27; 585 NW2d 33 (1998) (citation and quotation marks omitted). It is not necessary that a plaintiff show a "fraudulent purpose" or intent on the defendant's behalf, or even that the defendant knew that the representation was false. *Id*. at 27-28. The plaintiff, however, must show that privity of contract existed between the plaintiff and the defendant. *Id*. at 28. "A claim for negligent misrepresentation requires plaintiff to prove that a party justifiably relied to his detriment on information prepared without reasonable care by one who owed the relying party a duty of care." *Fejedelem v Kasco*, 269 Mich App 499, 502; 711 NW2d 436 (2006) (citations and quotation marks omitted).

In the present matter, plaintiff's proofs at trial sufficiently established a claim of negligent misrepresentation. Defendants, through Kim and FHS, held themselves out as "specialists" in health care insurance coverage. Plaintiff, which is not engaged in the business

of health insurance coverage, was introduced to FHS for the purpose of obtaining counseling and advice with respect to health insurance coverage. Defendants' relationship with plaintiff created a duty to proceed under the proper standard of care. See *Brown v Brown*, 478 Mich 545, 552-553; 739 NW2d 313 (2007). As plaintiff's expert, Mr. Walker, testified at trial, insurance agents have a duty to treat their clients under the proper standard of care, which includes, but is not limited to, determining whether a company is a health insurer licensed to do business in the state, checking on consumer complaints, knowing whether the company exists, and determining whether the company has a history of paying its claims. Given this testimony and the undisputed fact that defendants acted as plaintiff's insurance agents, defendants' argument that plaintiff failed to show that defendants' owed plaintiff a duty lacks merit. Further, under such circumstances, it was reasonable that plaintiff relied upon the information that FHS, as a "specialist," provided regarding health insurance plans. *Fejedelem, supra* at 503. Thus, it cannot be said that plaintiff failed to establish "justifiable reliance." Further, it is plain that defendants did not exercise any reasonable care because defendants, through Kim, recommended to plaintiff what they represented to be first-dollar-coverage, full-coverage health insurance companies that were, in fact, self-funded benefit plans or nonexistent reinsurance coverage.

Because plaintiff pleaded these claims in the alternative and plaintiff produced more than sufficient proof of negligent misrepresentation, it is not necessary for us to consider defendants' arguments with respect to innocent misrepresentation. The trial court properly denied defendants' motions for a directed verdict and JNOV with respect to negligent and innocent misrepresentation.

## 2. FRAUD

Defendants next assert that plaintiff's actual fraud claim was not supported by sufficient evidence because plaintiff failed to establish by clear and convincing evidence that defendants made any false and material representations and that defendants acted in bad faith. Specifically, defendants point to evidence that they never spoke to anyone at Unibar and that there was no testimony that anyone other than CIC and Unibar participated in the last CIC/SPA contract or that defendants knew SPA would fail. We disagree.

To sufficiently allege a claim for fraud, a plaintiff must show that: "(1) the defendant made a material representation; (2) the representation was false; (3) when the defendant made the representation, the defendant knew that it was false, or made it recklessly, without knowledge of its truth as a positive assertion; (4) the defendant made the representation with the intention that the plaintiff would act upon it; (5) the plaintiff acted in reliance upon it; and (6) the plaintiff suffered damage." *M&D, Inc, supra* at 27 (citation and quotation marks omitted).

Here, defendants' agent, Kim, made multiple affirmative representations to plaintiff concerning the nature of the supposed health insurance companies that she presented to plaintiff. These representations were false, as Kim represented these companies as first-dollar, full-coverage health insurance companies, when in fact they were not. Moreover, defendants knew that these representations were false at the time that they were made to plaintiff. Both defendants knew that SPA's "reinsurance carrier [was not] on board," that SPA was using the premiums it received to pay claims, and that UltraMed was not paying its claims before they were recommended to plaintiff. Even if defendants

had not known that the representations were false, their actions would still be considered reckless—defendants' representations of these fraudulent companies were made without determining whether these companies were licensed health insurance companies and, in some instances, without conducting a due diligence. Further, it is plain that defendants made these false and material representations with the intention that plaintiff act upon them—defendants knew the type of coverage plaintiff sought for its employees and it presented numerous plans in accordance with plaintiff's needs. It is not surprising that plaintiff relied on defendants' representations because defendants held themselves out as "specialists" in health care coverage. Lastly, the damages plaintiff suffered are evident: plaintiff paid for its employees' claims out of pocket. Given this evidence, we cannot agree with defendants' additional argument that the evidence in support of plaintiff's claims is nominal and that the verdict was against the great weight of the evidence.

Further, defendants' argument that it was entitled to a directed verdict and, subsequently, JNOV because they never individually spoke to plaintiff lacks merit. Defendants' agent, Kim, presented the plans to plaintiff in the course of her employment with defendants. Kim testified at trial that it was defendants who "brought" the health care plans into the office for their employees to sell. A principal will be held liable for the acts of its agents committed in the course of employment. *Rogers v J B Hunt Transport, Inc*, 466 Mich 645, 650-651; 649 NW2d 23 (2002). We also find unavailing defendants' characterization of the evidence as showing that only CIC and plaintiff participated in the CIC/SPA contract and as failing to show that defendants knew SPA would fail. Plaintiff signed a reinsurance contract with CIC

when Kim advised and directed plaintiff to sign the new contract. Whether defendants knew that SPA would fail is irrelevant—it is enough that defendants materially represented SPA as a first-dollar, full-coverage insurance carrier.

Finally, defendants argue that plaintiff failed to establish a claim for silent fraud. The jury did not return a verdict against defendants for silent fraud and no judgment was entered against defendants on a claim of silent fraud. Defendants cannot appeal a judgment that was never entered, because they are not considered an "aggrieved party" with respect to silent fraud. MCR 7.203(A). After our review of the record, it is plain that the trial court did not err by denying defendants' motions for a directed verdict and JNOV with respect to plaintiff's fraud claim.

### 3. PROXIMATE CAUSE

Defendants also contend that plaintiff failed to establish proximate cause between defendants' alleged negligence, misrepresentation, and fraud and plaintiff's damages. In defendants' view, plaintiff's failure to deal directly with CIC caused Unibar's damages. In light of the evidence discussed above, we cannot agree. Further, defendants' argument essentially posits that plaintiff should have mitigated its damages by contacting CIC directly and that its failure to do so was the "sole" cause of its damages. Defendants' position lacks logic. "[A] proximate cause is a foreseeable, natural, and probable cause of the plaintiff's injury and damages." *Kaiser v Allen*, 480 Mich 31, 37-38; 746 NW2d 92 (2008) (citation and quotation marks omitted; alteration in original). A failure to mitigate may contribute to the harm a person suffers, but it is not the ultimate cause of the

harm. Here, it was readily foreseeable that defendants' sale of nonexistent insurance services to plaintiff would cause plaintiff harm. For all the above reasons, after viewing all the evidence and legitimate inference in the light most favorable to plaintiff, we conclude that the trial court did not err by denying defendants' motions for a directed verdict and JNOV.

### III. MOTION FOR A NEW TRIAL

Defendants argue that the trial court erred by denying their motion for a new trial. Defendants raise five specific grounds upon which the motion should have been granted.

### A. STANDARD OF REVIEW

"A trial court's decision regarding a motion for a new trial is reviewed for an abuse of discretion. An abuse of discretion occurs when a court chooses an outcome that is not within the principled range of outcomes." *McManamon v Redford Charter Twp*, 273 Mich App 131, 138; 730 NW2d 757 (2006) (citations omitted).

### B. EVIDENCE

Defendants first contend that the cease and desist orders from Florida and Texas were irrelevant hearsay, based on mere allegations, and were unfairly prejudicial rather than probative. Defendants have waived this argument on appeal. Defendants stipulated the admission of all the exhibits presented at trial, including both the Florida and Texas cease and desist orders, and cannot now argue error on appeal. *Glen Lake-Crystal River Watershed Riparians v Glen Lake Ass'n*, 264 Mich App 523, 527-528; 695 NW2d 508 (2004).

### C. JUROR MISCONDUCT

Defendants next argue that they were prejudiced because the jury foreperson allegedly brought into deliberations documents not admitted into evidence that had an extraneous influence on the jury. Specifically, the foreperson provided two chart summaries showing all the participants in the case, including a description of their testimony, as well as a time line of events. According to defendants, this conduct materially affected their substantial rights because the jury cannot "defer to one person who prepared a summary of the testimony . . . ." Defendants contend, without any supporting evidence, that the foreperson prepared these documents at home. We do not agree that the complained of conduct warrants a new trial.

Juror misconduct may require a new trial under certain circumstances, but does not require a new trial in every instance. *People v Strand*, 213 Mich App 100, 103; 539 NW2d 739 (1995). Jurors are to consider only the evidence presented to them in open court. *People v Budzyn*, 456 Mich 77, 88; 566 NW2d 229 (1997). In order to establish that extraneous facts not introduced into evidence influenced the jury and requires a new trial, a defendant must show (1) that the jury was an exposed to an extraneous influence and (2) that the influence "created a real and substantial possibility [it] they could have affected the jury's verdict." *Id.* at 89. With respect to the second element, a defendant must "demonstrate that the extraneous influence is substantially related to a material aspect of the case and that there is a direct connection between the extrinsic material and the adverse verdict." *Id.*

Defendants have failed to make the requisite showing. First, the jurors in the case were specifically instructed that they could take notes during the

proceedings. Defendants produced no supporting evidence that these documents were prepared at home or that they contained extraneous information not presented in open court. Thus, because these summaries were based on material presented at trial and the trial court permitted the jury to take notes, defendants have failed to show that the jury was exposed to an extraneous influence. *Id.* at 91. While it is not necessary for us to consider the second prong of the test, given our conclusion, we note that defendants have also failed to demonstrate prejudice. We fail to see how these chart summaries, based on evidence presented at trial, are related to a material aspect of the case in such a manner that they have a "direct connection between the extrinsic material and the adverse verdict." *Id.* at 89.

### D. INVALID VERDICT

Defendants also claim that a new trial is proper on the basis that the theories of liability submitted to the jury were invalid because the evidence did not support them. Further, in defendants' view, the size of the verdict indicates that the jury decided the case on an improper basis. We disagree. Defendants' argument is conditioned upon a finding that the theories of liability should not have been submitted to the jury. Because we have already concluded that the trial court did not err by denying defendants' motion for a directed verdict and submitting the theories of liability to the jury, defendants' argument that the resultant verdict was premised upon erroneous theories must also fail. We also reject defendants' contention that given the verdict's size the jury must have decided this matter on an improper basis. Defendants cite no authority in support of this proposition and, thus, we consider this argument

abandoned. *Mettler Walloon, LLC v Melrose Twp*, 281 Mich App 184, 220; 761 NW2d 293 (2008).

### E. INSUFFICIENT PROOFS AND EXCULPATORY TESTIMONY

Defendants assert that they are entitled to a new trial on the same grounds that they are entitled to a directed verdict and JNOV. Because we have already concluded that the trial court did not err by denying defendants' motions for a directed verdict and JNOV, it follows that these arguments do not warrant a new trial as an alternate form of relief.

For all the foregoing reasons, we conclude that the trial court did not abuse its discretion when it denied defendants' motion for a new trial.

### IV. DAMAGES

Defendants argue that the trial court erred by denying their motion for remittitur. In defendants' view, the award of exemplary damages was improper and the award of actual damages was not supported by sufficient proof.

### A. STANDARD OF REVIEW

"An appellate court should reverse the trial court's decision regarding a motion for . . . remittitur only if an abuse of discretion is shown." *Phillips v Deihm*, 213 Mich App 389, 404; 541 NW2d 566 (1995). "The proper consideration in granting . . . remittitur is not whether the verdict 'shocks the conscience' but whether the jury award is supported by the evidence." *Wilson v Gen Motors Corp*, 183 Mich App 21, 38; 454 NW2d 405 (1990). "[We] must defer to a trial court's decision because of the trial court's superior ability to view the evidence and evaluate

the credibility of the witnesses." *Bordeaux v Celotex Corp*, 203 Mich App 158, 171; 511 NW2d 899 (1993).

### B. EXEMPLARY DAMAGES

Defendants argue that plaintiff is not entitled to exemplary damages. We disagree. The purpose of exemplary damages is to make the injured party whole. *Hayes-Albion Corp v Kuberski*, 421 Mich 170, 187; 364 NW2d 609 (1984). Exemplary damages are recoverable only for intangible injuries or injuries to feelings, which are not quantifiable in monetary terms. *Ray v Detroit*, 67 Mich App 702, 704-705; 242 NW2d 494 (1976); *Ass'n Research & Dev Corp v CNA Financial Corp*, 123 Mich App 162, 171-172; 333 NW2d 206 (1983). "[W]here the grievance created is purely pecuniary in its nature, and is susceptible of a full and definite money compensation," exemplary damages are not permitted because the party may be made whole through monetary compensation. *Durfee v Newkirk*, 83 Mich 522, 526; 47 NW 351 (1890); *Hayes-Albion Corp, supra* at 187. "An award of exemplary damages is considered proper if it compensates a plaintiff for the 'humiliation, sense of outrage, and indignity' resulting from injuries 'maliciously, wilfully and wantonly' inflicted by the defendant." *Kewin v Massachusetts Mut Life Ins Co*, 409 Mich 401, 419; 295 NW2d 50 (1980) (citation omitted). This Court has permitted an award of exemplary damages to a corporation where the corporation suffered a loss of reputation as a skillful and competent company. *Joba Constr Co, Inc v Burns & Roe, Inc*, 121 Mich App 615, 642-643; 329 NW2d 760 (1982); see also *Jackson Printing Co, Inc v Mitan*, 169 Mich App 334, 341-342; 425 NW2d 791 (1988) (acknowledging that a corporation's status as a corporation, by itself, does not preclude an award of exemplary damages to the corporation); *Hayes-Albion*

*Corp, supra* at 187-188 (denying award of exemplary damages to a corporation that sought damages for the lost time of an employee).

Given these legal rules, defendants' assertion that plaintiff is not entitled to exemplary damages because plaintiff is a corporation is unavailing and is clearly wrong. However, defendants' contention that the types of injuries that plaintiff suffered were quantifiable in monetary terms, and therefore plaintiff is not entitled to exemplary damages, presents a more difficult inquiry. While it is plain that exemplary damages may be awarded to a corporation, the question becomes: What type of injury to a corporation may be compensated? Because a corporation does not have "feelings," the general definition of exemplary damages does not lend itself to delineating the types of injuries for which a corporation may be compensated with exemplary damages. However, the purpose of compensatory damages, which is to make the plaintiff whole, *Hayes-Albion Corp, supra* at 187, indicates that exemplary damages may be construed as appropriate for injuries to a corporation that cannot be measured or estimated in monetary terms. Clearly, a loss of reputation as a skillful company is unquantifiable and recoverable as exemplary damages, *Joba Constr Co, supra* at 642-643, as may be a loss of good will, or any damage to other types of company reputation amongst either employees or customers. While this does not provide courts with a clear-cut list of unquantifiable recoverable injuries, it can be said with certainty that future profits, as well as lost time of its employees, do not fit within this category. See *Hayes-Albion Corp, supra* 187-188. Further, in terms of producing sufficient evidence in support of exemplary damages, we note that "[i]t is not essential to present direct evidence of an injury to

the plaintiff's feelings. Rather, the question is whether the injury to feelings and mental suffering are natural and proximate in view of the nature of the defendant's conduct." *McPeak v McPeak (On Remand)*, 233 Mich App 483, 490; 593 NW2d 180 (1999).

In the present matter, the injury to plaintiff flows from the nature of defendants' actions. The evidence produced at trial shows that over a period of years, defendants willfully induced plaintiff to purchase, on multiple occasions, what was essentially a self-funded benefit plan represented as a first-dollar, full-coverage health insurance plan when defendants knew plaintiff sought full coverage insurance. Consequently, plaintiff's employees' claims were denied, they were unable to see their health care providers or obtain prescriptions, and in some instances were sued by their health care providers. In addition, plaintiff fielded "hundreds" of complaints from its employees and "a lot" of its employees quit their jobs because of the lack of health benefits. Thus, although plaintiff has not produced any direct evidence showing that its internal reputation has been damaged, it is plain, given the number of complaints and employees who left their employment with plaintiff, that plaintiff's reputation amongst its employees suffered as the proximate result of defendants' actions. See *id.* at 490. Such injuries are not compensable in quantitative terms and the award of exemplary damages was proper. See *Joba Constr Co, supra* at 642-643. Thus, defendants' argument that plaintiff's injuries could be quantified and that the award of exemplary damages was duplicative of the award of monetary damages lacks merit.

Given our conclusion, we must note that plaintiff never explicitly alleged that its internal reputation was

injured.[4] However, that is the exact inference to be drawn from all the evidence presented. In any case, to the extent that we have addressed issues not raised by the parties, we may do so if, in our view, the matter requires consideration and it is just to resolve the matter on that basis. *Paschke v Retool Industries (On Rehearing)*, 198 Mich App 702, 705-706; 499 NW2d 453 (1993), rev'd on other grounds 445 Mich 502 (1994); MCR 7.216(A)(7); see also *Tingley v Kortz*, 262 Mich App 583, 588; 688 NW2d 291 (2004). This is such a case. We fail to see how defendants would be prejudiced in any way given that defendants stipulated the jury instructions on exemplary damages and did not object when the jury was presented with those instructions.

We also reject defendants' argument that plaintiff failed to provide sufficient evidence of bad faith or ill will on defendants' part because plaintiff failed to show defendants made a "voluntary act." This argument is unavailing. Defendants provided plaintiff with promotional materials and documentation on various insurance plans through Kim, their agent. It is not necessary, where an agency relationship exists, to show a "voluntary act" of the principal because the principal will be held liable for the torts of its agent committed in the course of employment. *Rogers, supra* at 650-651.

We lastly reject defendants' argument that they did not have reasonable notice that plaintiff sought exemplary damages because plaintiff failed to plead them. Defendants stipulated the jury instructions, which included an instruction for exemplary damages. Because defendants stipulated these instructions, they cannot

---

[4] While somewhat poorly argued during closing argument, plaintiff's counsel nonetheless properly presented plaintiff's request for exemplary damages by referring to the internal "turmoil" that defendants' conduct had caused.

now argue that plaintiff's failure to plead exemplary damages resulted in a lack of reasonable notice. We consider this argument waived. *Glen Lake-Crystal River Watershed Riparians, supra* at 527-528. The trial court did not abuse its discretion by denying defendants' motion for remittitur with respect to exemplary damages.

### C. PECUNIARY DAMAGES

Defendants argue that plaintiff failed to produce supporting documentation for its claim for pecuniary damages. We disagree. "A party asserting a claim has the burden of proving its damages with reasonable certainty. Although damages based on speculation or conjecture are not recoverable, damages are not speculative merely because they cannot be ascertained with mathematical precision." *Ensink v Mecosta Co Gen Hosp*, 262 Mich App 518, 525; 687 NW2d 143 (2004) (citations and quotation marks omitted). It is sufficient if a plaintiff presents a reasonable basis for computation. *Berrios v Miles, Inc*, 226 Mich App 470, 478; 574 NW2d 677 (1997). Further, the certainty necessary to establishing the amount of damages is less once the fact of damages is established. *Hofmann v Auto Club Ins Ass'n*, 211 Mich App 55, 108; 535 NW2d 529 (1995).

In the present matter, defendants stipulated all the exhibits at trial, including an exhibit quantifying plaintiff's damages. Plaintiff's damages were reiterated through the testimony of plaintiff's vice president and defendants never objected to any of this testimony. Thus, defendants have waived any argument regarding whether the fact of damages has been established. *Glen Lake-Crystal River Watershed Riparians, supra* at 527-528.

Turning to defendants' argument that the evidence presented was not competent and sufficient, it is our view that the evidence presented adequately supported the jury's award of pecuniary damages. The arguments defendants posit on appeal are in regard to the credibility and believability of this evidence. Such matters are best left to the jury. *People v Milstead*, 250 Mich App 391, 404; 648 NW2d 648 (2002).

Further, because we have not found it appropriate to reduce the amount of pecuniary damages, we reject defendants' argument that the amount of exemplary damages and the associated legal, administrative, and accounting expenses should be reduced to be commensurate with the pecuniary damages. The trial court did not abuse its discretion by denying defendants' motion for remittitur.

Affirmed.