# STATE OF MICHIGAN

# COURT OF APPEALS

MERCANTILE BANK OF MICHIGAN,

        Plaintiff/Counter-
        Defendant/Appellee/Cross-
        Appellant,

v

CLMIA, LLC,

        Defendant/Third-Party
        Plaintiff/Cross-
        Defendant/Appellant/Cross-
        Appellee,

and

DANIEL B. LONGMAN,

        Defendant/Third-Party
        Plaintiff/Appellant/Cross-Appellee,

and

CLIA, INC.,

        Defendant,

and

WELLS FARGO BANK, N.A.,

        Defendant/Counter-Plaintiff/Cross-
        Plaintiff/Appellee,

and

WELLS FARGO ADVISORS, LLC, WILLIAM
OCKERLUND, and MICHAEL DRIVER,

        Third-Party Defendants/Appellees,

and

UNPUBLISHED
February 12, 2015

No. 316777
Kent Circuit Court
LC No. 09-001639-CZ

-1-

WACHOVIA BANK and WACHOVIA
SECURITIES, LLC,

                    Third-Party Defendants.
_____

Before: BORRELLO, P.J., and SERVITTO and SHAPIRO, JJ.

PER CURIAM.

CLMIA, LLC and Daniel B. Longman appeal as of right the trial court's orders granting summary disposition in favor of Wells Fargo Advisors, William Ockerlund, and Michael Driver on CLMIA's third-party claims against them, denying CLMIA's motion to dismiss Wells Fargo Bank's breach of contract claim against it, and granting summary disposition in favor of Mercantile Bank and against CLMIA and Longman for breach of contract. Mercantile Bank cross-appeals as of right from the trial court's order granting CLMIA's motion for summary disposition in its favor as to Mercantile's equitable claims against CLMIA. We affirm.

In 2006, Daniel Longman, owner of CLMIA, LLC (a marine insurance agency) met William Ockerlund ("Ockerlund") and Michael Driver ("Driver"), stockbrokers who were employed by Wells Fargo Advisors, LLC (f/k/a Wachovia Securities, LLC) and they advised and assisted him in obtaining financing to purchase a marina in Florida. Longman obtained the financing through the purchase of variable rate bond securities in the amount of $6,150,000. In November 2006, the bond sale took place with Mercantile Bank of Michigan ("Mercantile") providing a letter of credit in support of the bonds and Longman signing a personal guarantee to Mercantile.

Approximately one month after the sale of the variable rate bonds, Driver recommended that CLMIA enter into an interest rate swap agreement as a purported way to "fix" the interest rate on the bonds. Acting upon this advice, CLMIA executed a Master Swap Agreement with Wachovia Bank (later known as Wells Fargo Bank and which shall hereafter be referred to as "Wells Fargo") in December 2006. Under the Master Swap Agreement, Mercantile was to act as a credit support provider (defined in the swap agreement as "each party to a Credit Support Document that provides or is obligated to provide security, a guaranty or other credit support for [CLMIA's] obligations under this Agreement, including, without limitation, Mercantile Bank of Michigan") for CLMIA in any swap transactions entered into by Wells Fargo and CLMIA pursuant to the agreements. At the same time, and unbeknownst to CLMIA, Mercantile also executed a "Master Swap Participation Agreement" with Wells Fargo obligating it to pay Wells Fargo any amounts that CLMIA became required to pay under the swap transactions but failed to pay.

Wells Fargo and CLMIA immediately entered into a swap transaction under the terms of the Master Swap Agreement and from December 2006 to June 2007 the swap transaction resulted in monthly payments of approximately $1,000 from Wells Fargo to CLMIA. The swap transaction was terminated around June 2007, and CLMIA received a termination fee, as required under the Master Swap Agreement, from Wells Fargo. Driver then recommended that

CLMIA enter into another swap transaction with Wells Fargo in August of 2007 and CLMIA agreed. This transaction was not profitable to CLMIA and resulted in CLMIA paying significant monthly amounts to Wells Fargo. In the spring of 2008, CLMIA indicated to Driver that it wanted to terminate the swap transaction and was advised that it could not do so without paying a significant termination fee to Wells Fargo. According to CLMIA, it still wanted to terminate the swap transaction and advised Driver of the same. In November 2008, Longman advised Wells Fargo that it would no longer be making the monthly swap transaction payments owed. Rather than terminate the contract, or accept CLMIA's termination, however, Wells Fargo accepted the monthly payments from Mercantile that CLMIA failed to make.

Mercantile thereafter initiated this action against CLMIA and Longman seeking repayment of the monies it had paid to Wells Fargo under its Master Swap Participation Agreement on theories of subrogation, reimbursement, exoneration rights as guarantor and subrogee, and breach of guaranty. Mercantile further sought enforcement of its indemnification rights against CLMIA, and pursued claims of unjust enrichment and implied contract and sought a declaration that Mercantile is entitled to be subrogated to Wells Fargo's current and potential right to future payments.

On CLMIA and Longman's motion, the trial court granted summary disposition in favor of CLMIA with respect to the equitable relief sought in Mercantile's complaint (equitable subrogation, equitable indemnification, unjust enrichment, and implied contract) and further granted summary disposition in favor of Longman, but allowed Mercantile to amend its complaint. In its amended complaint, Mercantile claimed breach of contract, and sought declaratory relief regarding the breach of contract and the guaranty obligations of Longman.

CLMIA filed a third-party complaint against Wells Fargo, Wells Fargo Securities, LLC, Ockerlund, and Driver alleging fraud, fraudulent inducement, negligent misrepresentation, negligence per se, and breach of fiduciary duty. Wells Fargo filed a counter-complaint against Mercantile and a cross-claim against CLMIA. In its counter-complaint, Wells Fargo asserted that CLMIA did not make payments as it was supposed to under the Master Swap Agreement and swap transaction and that Wells Fargo terminated the agreement on August 24, 2010. Wells Fargo claimed that according to the participation agreement, Mercantile is obligated to pay CLMIA's termination amount to Wells Fargo, which is $624,656.46 and that it did not pay the same, thus breaching its contract with Wells Fargo. In its cross-claim against CLMIA, Wells Fargo asserted that CLMIA's failure to pay the termination amount set forth in the Master Swap Agreement amounts to a breach of contract.

The trial court ultimately dismissed all of CLMIA's third-party claims against Wells Fargo, Wells Fargo Securities, LLC, Ockerlund, and Driver. The trial court further determined that the Master Swap Agreement was valid and enforceable, that an "event of default" under the definition set forth in Master Swap Agreement was CLMIA's nonpayment of the August 2010 monthly payment due under the relevant swap transaction and that August 24, 2010, was the early termination date of the Master Swap Agreement. The trial court also declared that when CLMIA and Longman failed to tender the amounts due after notified by Wells Fargo, Mercantile became obligated to pay the same. Upon payment by Mercantile of the swap liabilities, Wells Fargo would be obligated to assign to Mercantile all of its rights under the swap agreement. The

trial court gave the parties 30 days upon which to agree to the actual amount of the swap liabilities owed.

After extensive briefing concerning the swap transaction early termination fee calculation, the trial court entered an order setting forth the termination fee under the master swap agreement as $624,656.46 plus interest of $11,724.73 and ordering CLMIA to pay Wells Fargo the same. Under the order, if CLMIA did not pay the amount ordered, Mercantile was to pay the fees and Wells Fargo was to assign all of its rights under the swap to Mercantile. Mercantile was thereafter substituted for Wells Fargo given that Wells Fargo had assigned its rights under the Master Swap Agreement to it and Longman had executed an amended and restated guaranty in favor of Mercantile. The trial court thereafter entered a judgment in favor of Mercantile and against CLMIA and Longman, jointly and severally, in the amount of $624,656.46 plus $11,724.73 interest.

## CLMIA and Longman's Appeal

On appeal, CLMIA first argues that the trial court erred in granting summary disposition in favor of Ockerlund and Driver on CLMIA's third-party claims of fraud against them. We disagree.

We review de novo a trial court's decision on a motion for summary disposition. *Dressel v Ameribank*, 468 Mich 557, 561; 664 NW2d 151 (2003). A motion under MCR 2.116(C)(8) tests the legal sufficiency of the plaintiff's complaint by the pleadings alone. *Patterson v Kleiman*, 447 Mich 429, 432; 526 NW2d 879 (1994). All well-pleaded factual allegations are taken as true, as well as any reasonable inferences or conclusions that can be drawn from the allegations. *Peters v Dep't of Corrections*, 215 Mich App 485, 486; 546 NW2d 668 (1996). The motion should be granted only if the claims are so clearly unenforceable as a matter of law that no factual development could justify recovery. *Id*.

Pursuant to MCR 2.112(B)(1), "[i]n allegations of fraud or mistake, the circumstances constituting fraud or mistake must be stated with particularity." "Michigan's contract law recognizes several interrelated but distinct common-law doctrines—loosely aggregated under the rubric of 'fraud'—that may entitle a party to a legal or equitable remedy if a contract is obtained as a result of fraud or misrepresentation." *Titan Ins Co v Hyten*, 491 Mich 555; 817 NW2d 562 (2012). These include, among others, fraudulent misrepresentation (actionable fraud), innocent misrepresentation, and silent fraud, all of which contain separate elements. *Id*. at 557. As a general rule, actionable fraud consists of the following elements: (1) the defendant made a material representation; (2) the representation was false; (3) when the defendant made the representation, the defendant knew that it was false, or made it recklessly, without knowledge of its truth as a positive assertion; (4) the defendant made the representation with the intention that the plaintiff would act upon it; (5) the plaintiff acted in reliance upon it; and (6) the plaintiff suffered damage. *M&D, Inc v W.B. McConkey*, 231 Mich App 22, 27; 585 NW2d 33 (1998). Further, an action for fraudulent misrepresentation must be predicated upon a statement relating to a past or an existing fact; future promises are contractual in nature and do not constitute actionable fraud. *Kamalnath v Mercy Memorial Hosp Corp*, 194 Mich App 543, 554; 487 NW2d 499 (1992); *Hi-Way Motor Co v Int'l Harvester Co*, 398 Mich 330, 336; 247 NW2d 813 (1976).

In its third-party complaint, CLMIA asserted that "[a]fter Longman, on behalf of Charter lakes, executed the Master Swap Agreement and Schedule of Master Swap Agreement, Driver [and Ockerlund] made material representations to Longman regarding the referenced Swap Agreement. Driver [and Ockerlund] made these misrepresentations to Longman and Charter Lakes with knowledge that said representations were false, or were made with reckless disregard of the truthfulness of the statements." CLMIA further alleged that the representations "which are specified in the factual circumstances pled above" were, in fact, false, and that Longman and CLMIA acted in reliance on the representations and were harmed as a result. The complaint contained a "factual allegations" sections indicating that Ockerlund and Driver acted as financial advisors to CLMIA. According to the complaint, Driver faxed Longman two pages of a Master Swap Agreement with Wells Fargo to sign and he did so, without receiving the remaining pages of the agreement until 18 months later. CLMIA alleged in the complaint that it entered into the Swap Agreement based solely on the advice of Driver and Ockerlund and on their representations that CLMIA would likely benefit from the agreement, that its risk of financial exposure was minimal, that it would only have to pay sums to the bank if CLMIA effected an early termination under the agreement, and that they would watch over the accounts and could unwind the agreement if CLMIA had to pay too much, when, in fact, none of the above were true.

As indicated by the trial court, CLMIA did not specify any particular statements that Ockerlund or Driver made *after* the Master Swap Agreement was entered into and upon which CLMIA relied. All identified statements were statements made prior to the execution of the swap agreement. Because CLMIA has set forth a separate claim for fraudulent inducement, that type of fraud is not at issue in the claims presented here and entitled simply "fraud." CLMIA's reference to an allegation in its complaint wherein it asserted that if Ockerlund and Driver had disclosed the actual terms and potential risk of entering into the swap agreement, CLMIA would not have entered into the swap agreement is relevant only to its fraudulent inducement claim. Similarly, CLMIA's reference to allegations in its complaint that Ockerlund and Driver were fiduciaries and thus CLMIA reasonably relied upon their representations is relevant only to its separately pleaded breach of fiduciary duty claims.

CLMIA must have pleaded all of the necessary elements of some type of fraud other than fraud in the inducement in these counts to survive summary disposition. CLMIA realizes as much, having predicated these fraud claims on statements made "[a]fter Longman, on behalf of Charter lakes, executed the Master Swap Agreement and Schedule of Master Swap Agreement . . . ." Yet, CLMIA's general allegations appear to relate solely to its entry into the Master Swap Agreement in the first place. As noted by the trial court, CLMIA could not have reasonably relied on statements made to it *after* the swap agreement was entered into when deciding whether to enter into the swap agreement in the first place. Lacking identification of any post-execution statements made by Ockerlund and Driver in these counts, CLMIA has failed to establish that it acted in reliance on any such statements sufficient to meet element (5) of a fraudulent misrepresentation claim. *M&D, Inc*, 231 Mich App at 27.

While CLMIA relates, in a single paragraph, that false representations were made after the Master Swap Agreement was executed and refers to statements produced and transcribed during discovery, third-party defendants' motion was based upon MCR 2.116(C)(8). A motion under MCR 2.116(C)(8) tests the legal sufficiency of the plaintiff's complaint by the pleadings

-5-

alone. *Patterson*, 447 Mich at 432. Reference to anything produced during discovery is thus inappropriate and irrelevant. The trial court's ruling was based on the pleadings alone.

The trial court indicated that CLMIA's position appeared to be that third-party defendants were liable for silent fraud because they did not disclose at a July 2008 meeting that the prior misrepresentations created an automatic right to terminate the agreement and further failed to disclose that the agreement was "materially flawed." To prove silent fraud, the plaintiff must show that the defendant suppressed the truth with the intent to defraud the plaintiff and that the defendant had a legal or equitable duty of disclosure. *Lucas v Awaad*, 299 Mich App 345, 363-364; 830 NW2d 141(2013). "A plaintiff cannot merely prove that the defendant failed to disclose something; instead, a plaintiff must show some type of representation by words or actions that was false or misleading and was intended to deceive." *Id.* at 364 (internal quotation omitted). And, as with other types of fraud, silent fraud requires reasonable reliance by the defrauded party. See *UAW-GM Human Resource Ctr v KSL Recreation Corp*, 228 Mich App 486, 504; 579 NW2d 411 (1998).

Assuming, without deciding, that third-party defendants had a duty to disclose that they made prior misrepresentations to third-party plaintiffs and that such misrepresentations created a right to terminate the agreement, or that the agreement was flawed and was unenforceable, not only did third-party plaintiffs fail to specifically plead that they relied on these misrepresentations, but they cannot establish that they did. To prove that they relied on the misrepresentations, third-party plaintiffs would necessarily have to show that they did not terminate the agreement, i.e., that they continued with the agreement because they relied on third-party defendants withholding of information that third-party plaintiffs could terminate the agreement. According to third-party plaintiffs, however, at the July 2008 meeting and afterwards, they indicated their intent to terminate the agreement to third-party defendants and Wells Fargo Bank. This termination was, according to third-party plaintiffs, simply not recognized by third-party defendants or Wells Fargo Bank. Thus reasonable reliance cannot be demonstrated.

Because CLMIA asserted in its third-party complaint that it was given only two pages of the Master Swap Agreement to sign, it could perhaps be claimed that CLMIA's fraud claims against Ockerlund and Driver were based upon fraud in the execution. Fraud in the execution occurs when a party does not know the contents of the instrument. *Stefanac v Cranbrook Ed Community*, 435 Mich 155, 165–166; 458 NW2d 56 (1990). This type of fraud occurs when the proponent of the instrument told the signatory thereof that the instrument really didn't mean what it clearly said, and that the signatory relied on this fraud to his detriment. *Paul v Rotman*, 50 Mich App 459, 463–464; 213 NW2d 588 (1973). All fraud requires that a plaintiff establish reasonable reliance on an alleged material misrepresentation. *Zaremba Equip, Inc v Harco Nat'l Ins Co*, 280 Mich App 16, 39; 761 NW2d 151 (2008). And, "[t]here can be no fraud where a person has the means to determine that a representation is not true." *Nieves v Bell Industries, Inc*, 204 Mich App 459, 464; 517 NW2d 235 (1994). "As this Court has explained, that general rule is only applied when the plaintiffs were either presented with the information and chose to ignore it or had some other indication that further inquiry was needed." *Alfieri v Bertorelli*, 295 Mich App 189, 195; 813 NW2d 772 (2012)(quotation and citation omitted).

Here, the fact is that Longman signed an agreement for CLMIA allegedly without reading it or understanding the transaction. He had already received the financing that he sought for the marina through variable rate bonds. He did not have to agree to the interest rate swap agreement. Longman claims that he was faxed only the signature pages of the agreement to sign. However, the first signature page containing Longman's signature bears page number "18" at the bottom. The second signature page bears the page number "8" at the bottom. Clearly, then, these were lengthy documents. The length of the documents was an indication that further inquiry was needed. *Alfieri*, 295 Mich App at 195. This Court has held that "a person who signs and executes an instrument without inquiring as to its contents cannot have the instrument set aside on the ground of ignorance of the contents." *Christensen v Christensen*, 126 Mich App 640, 645; 337 NW2d 611, (1983). A related and equally settled principle of Michigan contract law is that "one who signs a contract will not be heard to say, when enforcement is sought, that he did not read it, or that he supposed it was different in its terms." *Shay v Aldrich*, 487 Mich 648, 680-681; 790 NW2d 629 (2010)(citation omitted). Moreover, while Longman claims to have received only the two signatory pages of the documents, the entire Master Swap Agreement was attached as an exhibit to CLMIA's appeal brief, was signed by Longman on December 1, 2006, and contains what appears to be facsimile stamps on the top of each page containing the name "CHARTER LAKES INSURANCE" as well as the date of "Dec-04-2006" and a time. This indicates that CLMIA did receive the entirety of the Master Swap Agreement. The trial court properly dismissed the fraud claims against Ockerlund and Driver.

Because the fraud claim against Wells Fargo Bank is based only upon its "review and ratification" of the misrepresentations by Ockerlund and Driver, a failure of the fraud claims against those third-party defendants requires a failure of the fraud claim against Wells Fargo Bank. The trial court thus properly dismissed this claim as well.

CLMIA and Longman next claim that the trial court erred in dismissing their negligent misrepresentation claim against Ockerlund, Driver, and Wells Fargo Advisors. We disagree.

"A claim for negligent misrepresentation requires plaintiff to prove that a party justifiably relied to his detriment on information prepared without reasonable care by one who owed the relying party a duty of care." *Unibar Maintenance Servs, Inc v Saigh*, 283 Mich App 609, 621; 769 NW2d 911 (2009) (citations and quotation marks omitted). Our Supreme Court has defined "duty" as a "question of whether the defendant is under any obligation for the benefit of the particular plaintiff and concerns the problem of the relation between individuals which imposes upon one a legal obligation for the benefit of the other." *Brown v Brown*, 478 Mich 545, 552-553; 739 NW2d 313 (2007)(internal citation omitted). According to *Brown*, "duty" is "an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection." *Id*. Whether a duty exists depends on (1) the relationship of the parties, (2) the foreseeability of the harm, (3) the degree of certainty of injury, (4) the closeness of the connection between the conduct and the injury, (5) the moral blame attached to the conduct, (6) the policy of preventing future harm, and (7) the burdens and consequences of imposing a duty and the resulting liability for breach. *Rakowski v Sarb*, 269 Mich App 619, 629; 713 NW2d 787 (2006).

This negligent misrepresentation theory of relief is a means for holding a party liable for the negligent performance of a contract to third parties who are foreseeably injured by the

negligent performance. See *Williams v Polgar*, 391 Mich 6, 20–23, 215 NW2d 149 (1974). Again, however, "[t]here can be no fraud where a person has the means to determine that a representation is not true," *Nieves*, 204 Mich App at 464, such as "when the plaintiffs were either presented with the information and chose to ignore it or had some other indication that further inquiry was needed." *Alfieri*, 295 Mich App at 195.

The trial court dismissed the negligent misrepresentation claims against Ockerlund, Driver, and Wells Fargo Advisors under MCR 2.116(C)(8) without analysis or explanation.

In their specific claim for negligent misrepresentation, CLMIA and Longman alleged that:

> 76. Wachovia Bank, Wachovia Securities, Ockerlund, and Driver made and/or adopted or ratified material misrepresentations regarding the referenced Swap Agreement before and after its execution to Longman and [CLMIA] with negligent disregard for the truthfulness of the statements.
>
> 77. These representations, which are specified in the factual circumstances plead above, are in fact false.
>
> 78. Longman acted in reliance on these material misrepresentations of fact when he executed the last page of the Master Swap Agreement and the Schedule to the Master Swap Agreement on behalf of Charter Lakes.
>
> 79. Charter Lakes, as a result of acting on the negligently made material misrepresentations of the Third-party Defendants, has incurred damages .
> . . .

In their factual allegations, CLMIA and Longman asserted that Driver and Ockerlund acted as their financial advisors, and represented that they could stabilize the rate of the variable rate bonds by way of a swap agreement. They further alleged that Ockerlund and Driver advised that Charter Lakes "would likely benefit from the contract and that the agreement did not impose an undue financial risk" and assured Longman that "Charter Lakes would not suffer significant losses under the Swap Agreement," indicating that, at most, Charter Lakes would have to pay around $2,000 per month and that Ockerlund and Driver would unwind the swap if it proved unbeneficial. CLMIA and Longman alleged that contrary to the representations, the swap agreement did and has exposed Charter Lakes to significant financial risk (i.e., Charter Lakes' liability to Wachovia Bank). They also alleged that:

> 41. Ockerlund, Driver, and Wachovia Securities, as the fiduciaries for Charter Lakes, had an obligation to assure that the conditions required under the contract to enter into the Swap Agreement were complied with and failed to do so.
>
> 42. These provisions were material to Charter Lake's best interests and [third-party defendants] all acted in concert to deprive Charter Lakes of these protections in order to obtain its participation in the Swap Agreement.

No party has directed this Court to authority indicating that a financial advisor who has no control over a client's money has a fiduciary duty to a client. Under New York law, (which the Master Swap Agreement states is to be applied, but which the parties often ignore), it has been held that professionals, such as investment advisors, who owe fiduciary duties to their clients may be subject to tort liability for failure to exercise reasonable care. *Bullmore v Ernst & Young Cayman Is*, 45 AD3d 461, 463 (1st Dept 2007). However, it appears that only a financial advisor with discretionary authority to manage a client's investment accounts owes a fiduciary duty to the client. See, *Brooks v Key Trust Co Natl Assn*, 26 AD3d 628, 630 (3d Dept 2006). There has been no such allegation here.

Even assuming that third-party defendants were acting in the official capacity of financial advisors when they spoke to CLMIA and Longman concerning the interest swap, and assuming, without deciding, that they could be deemed to owe a fiduciary duty to CLMIA and Longman, we must still examine the statements attributed to third-party defendants as misrepresentations to determine whether they were prepared without reasonable care and whether CLMIA and Longman justifiably relied on the same to their detriment.

CLMIA and Longman's allegations that Ockerlund and Driver's statements that Charter Lakes "would likely benefit from the contract and that the agreement did not impose an undue financial risk" are not actionable as they are expressions of opinion or salesman's talk in promoting a sale, i.e., puffery. Expressions of opinion are not false statements of independently verifiable facts. *Mable Cleary Trust v Edward–Marlah Muzyl Trust*, 262 Mich App 485, 502; 686 NW2d 770 (2004). An action for fraud cannot be predicated upon an expression of opinion or upon puffery. *Van Tassel v McDonald Corp*, 159 Mich App 745, 750; 407 NW2d 6 (1987); *High Tides, LLC v DeMichele*, 88 AD 3d 954, 958; 931 NYS2d 3771 (2011). The statements likewise concerned future events. In general, an action for fraud cannot be based on the failure of future events to transpire as represented or predicted. See *Foreman v Foreman*, 266 Mich App 132, 143; 701 NW2d 167 (2005); *Marrero v McDonnell Douglas Capital Corp*, 200 Mich App 438, 444; 505 NW2d 275 (1993); *Cerabono v Price*, 7 AD3d 479, 480 (2nd Dept 2004) ("[t]he general rule is that fraud cannot be predicated upon statements that are promissory in nature at the time they are made and which relate to future actions or conduct").

The same holds true for statements that Charter Lakes would not suffer significant losses under the Master Swap Agreement. The alleged misrepresentation that third-party defendants would monitor interest rates and unwind the swap agreement if it appeared Charter Lakes would have to pay an interest rate differential and that, at most, Charter Lakes would have to pay around $2,000 per month, concerned future events and thus were not actionable. *Foreman*, 266 Mich App at 143; *Marrero*, 200 Mich App at 444.

Additionally, CLMIA and Longman did not allege that any of the alleged misrepresentations were based upon on "information prepared without reasonable care" by third-party defendants. *Unibar Maintenance Servs, Inc*, 283 Mich App at 621. There is no assertion, for example, that third-party defendants had the means to determine whether the representations were true, any more than CLMIA and Longman did, and failed to undertake the proper determination as to the truth of their representations or that they did not, in fact, ascertain whether the representations were true when made. Some intervening circumstance could, after all, have made the perhaps once-true representations false (a change in the market, etc.).

-9-

Finally, as previously indicated, Longman signed the Master Swap Agreement for CLMIA, binding it to the terms, without reading it. Having only allegedly received two pages, one bearing a page "18" and one bearing a page "8", Longman was on notice that that the documents were lengthy and that was a clear indication that further inquiry was needed. *Alfieri*, 295 Mich App at 195. CLMIA and Longman's reliance on *any* representations made by third-party defendants concerning the Agreement's terms, the risks it posed, etc., when Longman did not read the Agreement and was aware that it was lengthy, vitiates a claim of reasonable reliance. This is particularly so, given that the Master Swap Agreement was between CLMIA and *Wells Fargo Bank*-not third-party defendants. Had CLMIA and Longman required further information concerning the Agreement's terms, the best provider of information, including a copy of the entirety of the Agreement they claimed they did not originally receive, would have been Wells Fargo Bank. The trial court properly dismissed the third-party claim of negligent misrepresentation.

CLMIA and Longman next assert that the trial court erred in finding that the swap agreement at issue was unrelated to a security and in dismissing CLMIA's claim for negligence per se based on violations of the Michigan Uniform Securities Act. We disagree.

A plaintiff may establish negligence per se by proving that a defendant violated a statutory duty. *McKinney v Anderson*, 373 Mich 414, 419; 129 NW2d 851 (1964). For a court to determine that a statutory violation amounted to negligence per se certain elements must exist. (1) The statute must be "intended to protect against the result of the violation," (2) the plaintiff must be "within the class intended to be protected by the statute," and (3) the statutory violation must be a proximate cause of the plaintiff's injury. *Klanseck v Anderson Sales & Serv, Inc*, 426 Mich 78, 87; 393 NW2d 356 (1986).

In their claim of negligence per se against Ockerlund and Driver, CLMIA and Longman alleged that these third-party defendants were "investment advisors" as defined in the Michigan Uniform Securities Act ("MUSA") and that they violated MCL 451.502[1] (now MCL 451.2501). CLMIA and Longman alleged that these statutory violations created a presumption of negligence per se. The trial court, however, opined that both the definition of investment advisor under MUSA and MCL 451.502 require the involvement of a security in the transaction and that the swap agreement is not a security such that the MUSA is inapplicable. We agree.

Under the MUSA, at MCL 451.2102a:

(e) "Investment adviser" means a person that, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or the advisability of investing in, purchasing, or selling securities or that, for compensation and as a part of a regular business, issues or promulgates analyses or reports concerning securities. The term includes a financial planner or other person that, as an integral component of other

---

[1] Repealed by P.A. 2008, No. 551 § 702, Eff. October 1, 2009. At the time the trial court issued its opinion, on October 9, 2009, the new Michigan Uniform Securities Act had come into effect.

financially related services, provides investment advice to others for compensation as part of a business or that holds itself out as providing investment advice to others for compensation. The term does not include any of the following:

(*i*) An investment adviser representative.

(*ii*) A lawyer, accountant, engineer, or teacher whose performance of investment advice is solely incidental to the practice of the person's profession.

(*iii*) A broker-dealer or its agents whose performance of investment advice is solely incidental to the conduct of business as a broker-dealer and that does not receive special compensation for the investment advice.

(*iv*) A publisher of a bona fide newspaper, news magazine, or business or financial publication of general and regular circulation.

(*v*) A federal covered investment adviser.

(*vi*) A depository institution.

(*vii*) Any other person that is excluded by the investment advisers act of 1940 from the definition of investment adviser.

(*viii*) Any other person excluded by rule or order under this act.

(*ix*) A finder registered as a broker-dealer under this act.

The former version of this rule (relied upon by the trial court) defined "investment adviser" at MCL 451.801(l) as "any person who, for consideration, engages in the business of advising others, either directly or through publications or writings, as to the value of securities, or as to the advisability of investing in, purchasing, or selling securities, who, for consideration and as part of a regular business, issues or promulgates analyses or reports concerning securities, or who acts as a finder in conjunction with the offer, sale or purchase of a security. . . ." Excluded from this definition is a "broker-dealer or registered agent acting on behalf of a broker–dealer whose performance of these services is solely incidental to the conduct of his or her business as a broker-dealer and who receives no special compensation for the services." MCL 451.801(l)(3).

MCL 451.502(a)(1) and (2) prohibited an investment advisor from employing a device, scheme, or artifice to defraud a client or prospective client or to engage in an act, practice, or course of business that operates or could operate as a fraud or deceit upon a client or prospective client. MCL 451.2501 represents the prior MCL 451.502 and provides:

It is unlawful for a person, in connection with the offer, sale, or purchase of a security, to directly or indirectly do any of the following:

(a) Employ a device, scheme, or artifice to defraud.

-11-

(b) Make an untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

(c) Engage in an act, practice, or course of business that operates or would operate as a fraud or deceit on another person.

MCL 451.2502 similarly provides:

(1) It is unlawful for a person that advises others for compensation, either directly or indirectly or through publications or writings, as to the value of securities or the advisability of investing in, purchasing, or selling securities, or that, for compensation and as part of a regular business, issues or promulgates analyses or reports relating to securities, to do any of the following:

(a) Employ a device, scheme, or artifice to defraud another person.

(b) Engage in an act, practice, or course of business that operates or would operate as a fraud or deceit upon another person.

The MUSA currently defines security as follows:

(c) "Security" means a note; stock; treasury stock; security future; bond; debenture; evidence of indebtedness; certificate of interest or participation in a profit-sharing agreement; collateral trust certificate; preorganization certificate or subscription; transferable share; investment contract; voting trust certificate; certificate of deposit for a security; fractional undivided interest in oil, gas, or other mineral rights; put, call, straddle, option, or privilege on a security, certificate of deposit, or group or index of securities, including an interest in or based on the value of that put, call, straddle, option, or privilege on that security, certificate of deposit, or group or index of securities; put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency; an investment in a viatical or life settlement agreement; or, in general, an interest or instrument commonly known as a "security"; or a certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing. All of the following apply to the term security:

(*i*) The term includes a contractual or quasi-contractual arrangement that meets all of the following:

(A) A person furnishes capital, other than services, to an issuer under the arrangement.

(B) A portion of the capital furnished under sub-subparagraph (A) is subjected to the risks of the issuer's enterprise.

-12-

(C) The furnishing of capital under sub-subparagraph (A) is induced by representations made by an issuer, promoter, or the issuer's or promoter's affiliates which give rise to a reasonable understanding that a valuable tangible benefit will accrue to the person furnishing the capital as a result of the operation of the enterprise.

(D) The person furnishing the capital under sub-subparagraph (A) does not intend to be actively involved in the management of the enterprise in a meaningful way.

(E) At the time the capital is furnished, a promoter or its affiliates anticipate that financial gain may be realized as a result of the furnishing.

(*ii*) The term includes both a certificated and an uncertificated security.

(*iii*) The term does not include an insurance or endowment policy or annuity contract under which an insurance company promises to pay a fixed or variable sum of money either in a lump sum or periodically for life or other specified period.

(*iv*) The term does not include an interest in a contributory or noncontributory pension or welfare plan subject to the employee retirement income security act of 1974.

(*v*) The term includes an investment in a common enterprise with the expectation of profits to be derived primarily from the efforts of a person other than the investor. As used in this subparagraph, a "common enterprise" means an enterprise in which the fortunes of the investor are interwoven with those of either the person offering the investment, a third party, or other investors.

(*vi*) The term may include, as an investment contract, an interest in a limited partnership, a limited liability company, or a limited liability partnership.
MCL 451.2102c

"Security" was previously defined, in part, at MCL 451.801(z) as:

[A]ny note; stock; treasury stock; bond; debenture; evidence of indebtedness; certificate of interest or participation in any profit-sharing agreement; collateral trust certificate; preorganization certificate or subscription; transferable share; investment contract; voting trust certificate; certificate of deposit for a security; certificate of interest or participation in an oil, gas, or mining title or lease or in payments out of production under such a title or lease; or, in general, any interest or instrument commonly known as a "security", or any certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

As noted by the trial court, all of the elements of negligence per se pleaded by third-party plaintiffs require, at their core, the involvement of a security. Clearly, the MUSA does not include a swap transaction of any kind in its definition of "security." The MUSA substantially

tracks the language of the Uniform Securities Act (*People v Dempster*, 396 Mich 700, 704; 242 NW2d 381 (1976)), which is a model law authored in 1956 by the National Conference of Commissioners on Uniform State Laws, a group of state legislators, judges and legal scholars. *Bennett v Durham*, 683 F 3d 734, 736 (CA 6 2012). The Uniform Securities Act similarly does not include the term "swap" in its definition of "security." See Unif Securities Act 2002 § 102(28). The Uniform Securities Act, in turn, "is borrowed substantially" from the Securities Act of 1933. *Bennett*, 683 F 3d 734 at 737. This is notable because, the Securities Act of 1933, at 15 USC § 77b(a)(1) defines "security" as "any note, stock, treasury stock, security future, *security-based swap*. . . ."(emphasis added). Thus, it can be inferred that if a swap agreement of any kind were intended to be included within the meaning of a security, that specific term would have been included within the MUSA's (and the Uniform Security Act's) definition. Its conspicuous absence leads to the conclusion that a swap agreement was not intended to be considered a security for purposes of MUSA.

That being the case, CLMIA and Longman's assertion that third-party defendants were liable for negligence per se because they violated MCL 451.2501 (the prior MCL 451.502) fails to state claim for which relief could be granted. That statute prohibits a person from engaging in certain acts "in connection with the offer, sale, or purchase of a security. . . ." The swap agreement was not a security under the relevant definition and third-party defendants thus could not have violated this statute with respect to the swap agreement.

As pointed out by CLMIA, a bond falls within the MUSA's statutory definition of a security and the notional value in the swap agreement at issue was based upon the value of CLMIA's bonds. However, that does not mean that the swap agreement at issue was a "security based swap." New York law indicates that security-based swap agreements are "privately negotiated contracts that provide for the exchange of payments based on the value of the securities, and the transfer of the financial risks associated with changes in the value of the securities without the conveyance of any ownership interest." *Viking Global Equities, LP v Porsche Automobil Holding*, 36 Misc 3d 1233 (2012)(r'vsed on other grounds). Under this definition, the payment exchange and the transfer of financial risk are associated with changes in the value of the security. While the notional value in this case was based on the bonds (i.e., security, according to CLMIA), the payment exchange was not based on the value of the bonds and there was no transfer of financial risk associated with a change in the value of the bonds. The bonds had already been issued in a separate transaction, any risk associated with the value in the bonds stayed with CLMIA, and even if CLMIA paid off the bonds in full, the swap agreement would remain in full force. In addition, the payment exchange was always based on the fixed rate set forth in the swap agreement. The variable rate was based on the LIBOR, which fluctuated, and was the only factor that changed the payment amount. This was thus not a security based swap.

CLMIA and Longman next claim that the trial court erroneously dismissed CLMIA's claims for fraudulent inducement and breach of fiduciary duty against Ockerlund, Driver, and Wells Fargo Advisors. We disagree.

"Fraud in the inducement . . . addresses a situation where the claim is that one party was tricked into contracting. It is based on pre-contractual conduct . . . ." *Huron Tool & Engineering Co v Precision Consulting Services, Inc*, 209 Mich App 365, 373, 532 NW2d 541 (1995). It

arises where "the ability of one party to negotiate fair terms and make an informed decision is undermined by the other party's fraudulent behavior." *Id.* at 373.

To prove a claim of fraud in the inducement, a plaintiff must establish the following elements: "(1) the defendant made a material representation; (2) the representation was false; (3) when the defendant made the representation, the defendant knew that [it] was false, or made it recklessly, without knowledge of its truth and as a positive assertion; (4) the defendant made the representation with the intention that the plaintiff would act upon it; (5) the plaintiff acted in reliance upon it; and (6) the plaintiff suffered damage." *Rooyakker & Sitz, PLLC v Plante & Moran, PLLC*, 276 Mich App 146, 161; 742 NW2d 409 (2007).

Although not explicitly stated as such, Michigan caselaw appears to support the premise that a fraud in the inducement claim is applicable only to the parties to a contract. For example, when explaining why the economic loss doctrine does not apply to a fraudulent inducement claim, *Huron Tool and Engineering Co*, 209 Mich App at 372, stated, "[f]raud in the inducement presents a special situation where parties to a contract appear to negotiate freely-which normally would constitute grounds for invoking the economic loss doctrine-but where in fact the ability of one party to negotiate fair terms and make an informed decision is undermined by *the other party's* fraudulent behavior."(emphasis added).

New York caselaw, on the other hand, which is supposed to govern the Master Swap Agreement, supports a contrary conclusion. "A misrepresentation of a material fact which is collateral to the contract and serves as an inducement to enter into the contract is sufficient to sustain a cause of action sounding in fraud." *Selinger Enters, Inc v Cassuto*, 50 AD3d 766, 768 (2008); *WIT Holding Corp v Klein*, 282 AD2d 527, 528 (2001). This cause of action is not duplicative of a cause of action to recover damages for breach of contract where the plaintiff sues individuals who were not parties to the contract, and seeks compensatory damages which are not recoverable for breach of contract. *Selinger Enters, Inc* 50 AD3d at 768.

In any event, regardless of any representation made by Ockerlund or Driver, Longman signed the Master Swap Agreement and corresponding schedule. The Agreement provides, at paragraph 9.(a) that "This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto." The schedule to the Master Swap Agreement further provides at part 5. (c)(i):

> **Relationship Between Parties**. Each party will be deemed to represent to the other party on the date on which it enters into a Relevant Agreement that:
>
> (1) *Non-Reliance*. It is acting for its own account, and it has made its own independent decisions to enter into the Relevant Agreement and as to whether the Relevant Agreement is appropriate or proper for it based solely upon its own judgment and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party or any of its affiliates (or its respective representatives) as investment advice or as a recommendation to enter into the Relevant Agreement, it being understood that information and explanations related to the terms and conditions of any Relevant

Agreement will not be considered investment advice or a recommendation to enter into the Relevant Agreement. No communication (written or oral) received from the other party or any of its affiliates (or its respective representatives) will be deemed to be an assurance or guarantee as to the expected results of the Relevant Agreement.

(2) *Assessment and Understanding*. It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of the Relevant Agreement based solely upon its own evaluation of the Relevant Agreement (including the present and future results, consequences, risks, and benefits thereof, whether financial, accounting, tax, legal, or otherwise) or that of its own advisers. It is also capable of assuming, and assumes, the risks of the Relevant Agreement. It also understands that the terms under which any Transaction may be terminated early are set forth in this Agreement (or in the relevant Confirmation), and any early termination of a Transaction other than pursuant to such terms is subject to mutual agreement of the parties confirmed in writing, the terms of which may require one party to pay an early termination fee to the other party based upon market conditions prevailing at the time of early termination.

(3) *Status of Parties*. The other party is not acting as a fiduciary for an adviser to it in respect of the Relevant Agreement, and any agency, brokerage, advisory or fiduciary services that the other party (or any of its affiliates) may otherwise provide to the party (or any of its affiliates) excludes the Relevant Agreement.

The above agreement was entered into between Wachovia Bank and CLMIA (through Longman). It is undisputed that Ockerlund and Driver were employed by Wachovia Securities, LLC at the time the agreement was entered into. In Wachovia Corporation's 2006 annual report submitted to the SEC, Wachovia Securities, LLC is identified as Wachovia Corporations "retail securities brokerage subsidiary." Wachovia Bank is identified as its "primary banking affiliate." Black's Law Dictionary (7th ed.) defines "affiliate" as "a corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent, or sibling corporation." "Affiliate" is also defined in section 14 of the Master Swap Agreement as "subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, 'control' of any entity or person means ownership of a majority of the voting power of the entity or person."

CLMIA and Longman, in fact, alleged in their complaint that Wachovia Securities was a "wholly owned subsidiary of Wachovia Bank." Under any pertinent definition, Wachovia Securities was an affiliate of Wachovia Bank. And, CLMIA and Longman alleged that Ockerlund and Driver were employees or agents of Wachovia Securities. By signing the agreement, Longman expressly agreed, on behalf of CLMIA, that he was not "relying on any communication (written or oral) of [Wachovia Bank] or any of its affiliates (or its respective

representatives) as investment advice or as a recommendation to enter into the Relevant Agreement . . . ."

Because Longman affirmatively disclaimed that he acted under the advice of any affiliate of Wells Fargo in entering into the agreement, his claims of fraudulent inducement and breach of fiduciary duty fail. "It is beyond cavil that one cannot sign a writing explicitly disclaiming reliance on representations not contained in a contract and later aver that the court should disregard such a disclaimer . . . a claim for fraud is barred by the existence of a specific disclaimer and failure to exercise reasonable diligence." *Holzer v Mondadori*, 40 Misc 3d; 980 NY S2d 276 (2013).

Even absent the disclaimer, the statements attributed to Ockerlund and Driver and which CLMIA and Longman assert were false statements were, as previously indicated, expressions of opinion, puffery, and concerned future events. An action for fraud cannot be predicated on any of these. *Van Tassel,* 159 Mich App at 750; *Foreman*, 266 Mich App at 143; *Marrero*, 200 Mich App at 444; *High Tides, LLC*, 88 AD 3d at 958.

The breach of fiduciary duty claim was also properly dismissed, even in the absence of the disclaimer. CLMIA and Longman contend that because third-party defendants were not parties to the Master Swap Agreement, Michigan law should apply to analysis of this issue. A fiduciary duty arises when the relationship between two parties is "of such character that each must repose trust and confidence in the other and must exercise a corresponding degree of fairness and good faith." *Portage Aluminum Co v Kentwood Nat'l Bank*, 106 Mich App 290, 294; 307 NW2d 761 (1981); see also *The Meyer & Anna Prentis Foundation, Inc v Barbara Ann Karmanos Cancer Institute,* 266 Mich App 39, 43; 698 NW2d 900 (2005). When a fiduciary relationship exists, the fiduciary has a duty to act for the benefit of the principal regarding matters within the scope of the relationship. *Id.* Examples of fiduciary relationships are attorneys to clients, doctors to patients, trustees to beneficiaries, and guardians to wards. *Portage*, 106 Mich App at 294. Third-party plaintiffs have identified no Michigan law indicating that an investment advisor owes a fiduciary duty to a client.

And, if third-party defendants owed fiduciary duties to CLMIA and Longman, they failed to establish a material question of fact that third-party defendants breached these duties. CLMIA and Longman do not particularize how the recommendation to enter into the swap agreement constituted a deviation from the standard of care owed by an investment advisor. It cannot be ignored that Longman signed the Master Swap Agreement in December 2006 and that a swap transaction thereafter ensued from that date until July of 2007. CLMIA profited from the transaction due to prevailing interest rates and made no complaint. That transaction was terminated and Wells Fargo paid him a termination fee. CLMIA then entered into *another* swap transaction in August 2007 with Wells Fargo and it was only when interest rates were unprofitable to it and CLMIA had to start paying Wells Fargo money on a monthly basis that Longman raised objections and questions to the Master Swap Agreement. The original Master Swap Agreement governed both transactions.

In a November 27, 2007, recorded conversation with Driver, Longman stated that he had been watching interest rates and it did not look good. He said they were going to have to wait and it might turn around at the end of the year but if they "closed that position out" it would cost

a lot of money. Longman stated that he thought the bond was going to go back up and when it did, he wanted to get out of the swap and that he just hoped they could get out of it with minimal losses. Longman, then, clearly understood the volatile nature of the market and the fact that there were risks involved. There is no indication that Driver did not act for the benefit of Longman in recommending the interest rate swap when he did, in 2006. The claims of breach of fiduciary duty were appropriately dismissed pursuant to MCR 2.116(C)(10).

CLMIA and Longman next argue that Wells Fargo waived its cross-claim against CLMIA for breach of contract when it elected to continue to behave as though no breach had occurred for a period of 21 months and that the trial court thus erred in denying CLMIA's motion to dismiss Wells Fargo's breach of contract claim against it. We disagree.

Wells Fargo's breach of contract claim against CLMIA was premised upon CLMIA's failure to pay an August 2010 payment and the resulting termination fee allegedly owed under the terms of the Master Swap Agreement. CLMIA, however, asserted that because it breached the contract in December 2008 when it stopped paying the monthly payments owed and Wells Fargo continued under the contract with Mercantile performing in CLMIA's stead and did not provide notice of the breach to CLMIA within 6 months of CLMIA's December 2008 breach, Wells Fargo waived its breach of contract claim against CLMIA. The Master Swap Agreement provides specific parameters of what will constitute a default, or breach, of the agreement. Section 5 of the Master Swap Agreement governs Events of Default and Termination Events, providing in relevant part as follows:

> (a) *Events of Default*. The occurrence at any time with respect to a party or, if applicable, any Credit Support provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:--

> (i) *Failure to Pay or Deliver*. Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

From the above language, it is clear that a failure to pay a due payment does not, in and of itself, trigger a default event. Rather, the failure to pay, when due, *and* if not remedied within three days after notice of the failure to pay is given to the non-paying party gives rise to an event of default. "To interpret a contract, the reviewing court must confine itself to the four corners of the document and only consider extrinsic proof if the contract is ambiguous; if the contract is not ambiguous, it must be enforced according to the plain meaning of its terms." *Mid-State Industries, Ltd v State*, 986 NY S2d 637, 639 (2014). Thus, contrary to CLMIA's assertion, its failure to pay in December 2008 and thereafter did not automatically constitute a recognizable breach of the swap agreement (i.e., default). While the failure to pay was technically a breach of its obligation under the Master Swap Agreement, under the relevant swap agreement language, Wells Fargo was not *required* to deem the non-payment by CLMIA in December 2008 (or thereafter) as a "default" unless and until it gave CLMIA notice of the default and three days to cure. It was not asserted that the above occurred.

Additionally, an event of default does not automatically terminate the Master Swap Agreement and give rise to the imposition of the early termination fee (the non-payment of which upon Wells Fargo's breach of contract action was primarily based). Section 6. of the Master Swap Agreement, entitled "Early Termination" provides:

> (a) ***Right to Terminate Following Event of Default***. If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") *may*, but not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions . . . .(emphasis added).

Section 6(e)(i) of the swap agreement provides for a payment made on early termination in the event of default and the various calculation methods that may be employed to determine the amount of such payment.

The word "may" is treated as permissive, under its general and usual meaning. See, e.g., *Babcock v Rose*, 169 Misc 2d 162, 168; 643 NYS2d 903 (1996). The non-defaulting party, in this case Wells Fargo Bank, "may" upon an event of default designate an early termination date, but it has no obligation to do so. Wells Fargo's continuation with the swap agreement, even after CLMIA discontinued making payments in December 2008 therefore provides no basis for CLMIA's claim that Wells Fargo Bank waived its breach of contract claim against it for failing to pay the termination fee. Wells Fargo was not limited under the Master Swap Agreement to wait, as it did, to declare an event of default when Mercantile discontinued paying the monthly fees and seek a termination fee from CLMIA after that time.

Moreover, while CLMIA asserts that Wells Fargo's claim should be precluded because it ignored CLMIA's December 2008 breach and continued performance of the Master Swap Agreement, CLMIA's assertion is incorrect. Wells Fargo could not have continued performance of the swap agreement because the only two participants in the agreement were Wells Fargo and CLMIA and CLMIA admittedly refused to participate in the agreement after December 2008. However, Wells Fargo and Mercantile had entered into a separate Master Swap Participation Agreement in December 2006. Under the terms of the participation agreement, Mercantile:

> irrevocably and unconditionally agrees to pay on demand by Swap Bank, without counterclaim or setoff, a percentage share, as set forth on a Participation Supplement (the "Percentage Share") of all Swap Liabilities (as defined below). As used herein, "Swap Liabilities" means, without duplication, with respect to each Counterparty and each Counterparty Transaction, (a) all amounts payable by such Counterparty to Swap Bank under Section 6(e) of the Counterparty Swap Agreement with respect to such Counterparty Transaction . . . (c) all unpaid interest due from such Counterparty to Swap Bank in respect of such Counterparty Transaction, and (d) all other amounts owing by such Counterparty to Swap Bank in respect of such Counterparty Transaction. . . .

Under the above, Mercantile agreed to pay to Wells Fargo any amounts that CLMIA owed to Wells Fargo under the swap transaction. This included the monthly payments. Thus, Wells Fargo simply enforced its separate Master Swap Participation Agreement with Mercantile, who complied with its own agreement for a time.

In its argument, and its cases cited, CLMIA appears to confuse the principles of waiver and election of remedies. "The doctrines of waiver and election of remedies are complementary rather than competing common law contract principles. Under the doctrine of waiver, a party may, by words or conduct, waive a provision in a contract or eliminate a condition in a contract which was inserted for [its] benefit." *ESPN, Inc v Office of Com'r of Baseball*, 76 F Supp 2d 383, 389 (1999)(citation omitted). The swap agreement here required CLMIA to pay Wells Fargo a monthly amount based upon the floating and fixed interest rates. CLMIA refused to pay that amount, and Wells Fargo had a separate contract with Mercantile requiring it to pay any amounts CLMIA did not pay. Mercantile indicated that it would pay the monthly amounts due and Wells Fargo could, conceivably, waive the contractual provision in the swap agreement requiring CLMIA to pay the monthly amount.

And, as indicated in *ESPN, Inc v Office of Com'r of Baseball*, 76 F Supp 2d 383, 389 note 4 (1999), a party's waiver of a contract provision is not absolute. That is, a previously waived provision may be restored " 'by a reasonable notice demanding performance and stating that the contract will be rescinded if the notice is not complied with.' " quoting *Oleg Cassini, Inc v Couture Coordinates, Inc*, 297 F Supp 821, 831 (1969). On August 13, 2010, Wells Fargo sent CLMIA a notice that it failed to make a payment as required under the transaction and that if it did not make the payment within 3 days, the failure to pay would become an event of default under the swap agreement. Thus it arguably restored any previously waived provision.

An election of remedies, on the other hand, is simply a choice among remedies by the party. "It is a decision by that party as to how it should proceed in the wake of the breaching party's nonperformance. In other words, an election is not a waiver of any rights under the contract but rather a choice between two inconsistent remedies for breach of the contract." *Id*. at 389.

Here, assuming that Wells Fargo treated CLMIA's December 2008 failure to pay as a breach or event of default, it would have to make a choice. It could send notice to CLMIA specifying the date of the event of default and designate an early termination date for the swap agreement, then calculate the termination fee. Then it would have elected termination and Wells Fargo could not continue to perform under the Master Swap Agreement or expect CLMIA's continued performance under the contract. It then could terminate the agreement and sue for damages stemming from a total breach. Alternatively, Wells Fargo could elect to continue the Master Swap Agreement despite CLMIA's December 2008 breach. In that case, it could not later decide to terminate the contract based upon the December 2008 breach, or treat the December 2008 breach as a default event. If we opt to look at this issue as an election of remedies issue, then Wells Fargo clearly chose the second option here. It did *not*, according to its pleadings or otherwise, base its breach of contract action on CLMIA's December 2008 non-payment. Wells Fargo specified that CLMIA breached the swap agreement by failing to make an August 2010 payment and failing to pay the swap agreement termination fee. The fact that the final judgment awarded Wells Fargo only the termination fee supports that Wells Fargo did not

treat the December 2008 failure to pay as a breach or default.  In either scenario, the trial court appropriately determined that Wells Fargo did not waive its breach of contract claim.

CLMIA and Longman's final argument is two-fold.  First, they argue that the trial court erred in granting summary judgment in favor of Mercantile because Mercantile had primary liability to pay the termination fee debt to Wells Fargo and, as such, could not hold a valid assignment of the debt from Wells Fargo.  Second, CLMIA and Longman argue that because Wells Fargo held no personal guaranty from Longman, the trial court erred in imposing personal liability for the termination debt upon Longman.

Based on previous discussions of pertinent language in the Master Swap Agreement, an event of default did not occur until CLMIA failed to pay a monthly amount due as required and then after notice from Wells Fargo, did not cure within three business days.  At that point, Wells Fargo could declare an event of default, terminate the contract, and calculate a termination fee.  That is what happened here in August 2010.  Once the termination fee was calculated, Wells Fargo had the right to collect that fee from CLMIA under the terms of the swap agreement.  As the trial court ordered on April 5, 2012, the termination fee was $636,381.19 given its previously found early termination date of August 24, 2010, and that CLMIA was responsible for paying that termination fee to Wells Fargo.  This was consistent with the language in the swap agreement.

The trial court also ordered in the April 5, 2012, order that if CLMIA failed to pay the termination fee to Wells Fargo then Mercantile would be obligated to pay the fee pursuant to the swap agreement.  The swap agreement provides at section 4.

> **Receipts by Swap Bank:  Remittances.**  It shall be Swap Bank's responsibility to terminate all Counterparty Transactions under the terms of a Counterparty Swap Agreement upon an Event of Default or a Termination Event thereunder. *Upon payment by Participant of the Percentage Share of all Swap Liabilities under a Counterparty Swap Agreement to Swap Bank, Swap Bank shall be obligated to assign to Participant all of Swap Bank's rights and responsibilities under such Counterparty Swap Agreement.*  After execution of the assignment documents between Participant and Swap Bank, Swap Bank shall have no further rights or responsibilities under the Counterparty Swap Agreement and it shall be solely the right of participant to enforce any and all assigned rights under the Counterparty Swap Agreement. (emphasis added)

The Participation Agreement defines "swap liabilities" as including "(a) all amounts payable by such Counterparty to Swap Bank under Section 6(e) of the Counterparty Swap Agreement with respect to such Counterparty Transaction" which is, in turn payments upon early termination of the swap agreement.  Thus, the trial court's order is in conformance with the above contracts.  The contracts clearly provide that CLMIA is liable for an early termination fee upon an event of default and an event of default was found to have occurred in August 2010.  CLMIA does not dispute that it did not pay the early termination fee as ordered by the court.  The Participation Agreement requires that Mercantile pay the termination fee if CLMIA does not and that, upon such payment, Wells Fargo must assign all of its rights and interest in the swap agreement to Mercantile upon its payment of the termination fee.  Wells Fargo had the right to collect the

termination fee from CLMIA. It thus assigned that right to Mercantile upon Mercantile's payment of the fee to Wells Fargo.

Contrary to CLMIA's assertion, Mercantile was not primarily liable for the termination fee. That is, Mercantile did not have an independent obligation to pay the termination fee. Its obligation only arose out of CLMIA's failure to pay the same. It is true that Mercantile's obligation to pay the fee arose out of its separate Participation Agreement with Wells Fargo. But, this Participation Agreement was referenced within the swap agreement on several occasions. Where one writing references another instrument for additional contract terms, the two writings should be read together. *Forge v Smith*, 458 Mich 198, 207; 580 NW2d 876 (1998).

For example, at section 3(a)(v) each party represents to the other party that "[i]ts obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations . . . ." A "Credit Support Document" is defined in the schedule to the Master Swap Agreement as "each document which by its terms secures, guarantees or otherwise supports [CLMIA's] obligations under this Agreement . . . ." Likewise, Mercantile's participation in the swap agreement is specifically referenced. Section 5(a)(iii)(1) of the Master Swap Agreement defines one event of default as "[f]ailure by the party or any Credit Support provider of such party to comply with or perform any agreement or obligation to be complied with . . . ." A credit support provider is defined in the schedule to the swap agreement as "each party to a Credit Support Document that provides or is obligated to provide security, a guaranty or other credit support for [CLMIA's] obligations under this Agreement, including, without limitation, Mercantile Bank of Michigan." Moreover, from the above definitions, it is clear that Mercantile was acting as a surety or guarantor.

With respect to whether Longman's guaranty binds him to be liable for the judgment entered against CLMIA and in favor of Mercantile, Longman incorrectly focuses on the guaranty executed in conjunction with the swap agreement and whether this guaranty is assignable. However, on October 31, 2011, Longman executed a guaranty in favor of Mercantile. In the guaranty, Longman as guarantor "absolutely, unconditionally and irrevocably guarantees prompt payment when due . . . of (a) any and all existing future indebtedness, obligations and liabilities . . . to [Mercantile] . . . and (c) any "Judgment", as that term is defined in Paragraph 4 below. . . ." Judgment is thereafter defined as "any order or judgment, whether a final judgment or not, awarding the Bank, either directly or indirectly, as an assignee or otherwise, any award of money, damages, interests, costs or attorneys' fees against [CLIA, CLMIA] or [Longman] in the lawsuit filed in Kent County Circuit Court, Michigan, captioned *Mercantile Bank of Michigan v CLMIA, LLC et al*, Case No. 09-01639-CZ (the "Lawsuit"), or in any other proceeding that may be brought regarding the subject matter of the Lawsuit." Thus, Longman agreed to guarantee the prompt payment of any judgment rendered against CLMIA in the instant case.

### Mercantile's Cross-Appeal

On cross-appeal, Mercantile contends the trial court erroneously accepted the factual allegation of CLMIA that an event of default under the Master Swap Agreement had occurred in granting CLMIA's motion for summary disposition concerning Mercantile's claims against it for

equitable relief. We find that the trial court's ultimate conclusion did not necessarily hinge upon its erroneous conclusion that an event of default had occurred.

This Court has the discretion to grant equitable relief where a legal remedy is not available. *Tkachik v Mandeville*, 487 Mich 38, 45; 790 NW2d 260 (2010). As explained in *Tkachik*:

> A remedy at law, in order to preclude a suit in equity, must be complete and ample, and not doubtful and uncertain. Furthermore, to preclude a suit in equity, a remedy at law, both in respect to its final relief and its modes of obtaining the relief, must be as effectual as the remedy which equity would confer under the circumstances. Equity jurisprudence molds its decrees to do justice amid all the vicissitudes and intricacies of life. While legislative action that provides an adequate remedy by statute precludes equitable relief, the *absence* of such action does not. This is so because every equitable right or interest derives not from a declaration of substantive law, but from the broad and flexible jurisdiction of courts of equity to afford remedial relief, where justice and good conscience so dictate. Equity allows complete justice to be done in a case by adapting its judgments to the special circumstances of the case. *Id*. at 45-46 (internal citations and quotations omitted).

In its May 10, 2010, opinion and order, the trial court did act under the assumption (or accept CLMIA's assertion) that an event of default occurred in December 2008 when CLMIA discontinued its required payments to Wells Fargo. The trial court indicated that the Participation Agreement delineates Wells Fargo's responsibilities if an event of default occurs under the swap agreement and that Mercantile was aware of these responsibilities when presented with a "claimed event of default." The trial court opined that "[Wells Fargo] and Mercantile . . . at their peril, chose to ignore the alleged default event" and that "Mercantile is contractually bound to pay only the amount of Swap Liabilities outstanding at the time of the event of default . . . ." under the Participation Agreement and that it further "cannot unilaterally increase its obligations and invoke equitable rights in light of unambiguous terms of the Agreements." The trial court did err in assuming or accepting that a default event did occur. Not only because this was a position advocated by the moving party, but also because as indicated previously, under the plain language of the Master Swap Agreement, the simple non-payment is not, by itself, a default event. Nevertheless, we will not reverse a lower court that reaches the right result for wrong reasons. *Taylor v Laban*, 241 Mich App 449, 458; 616 NW2d 229 (2000).

The trial court correctly recognized that the Participation Agreement provided, at section 4:

> **Receipts by Swap Bank: Remittances.** It shall be Swap Bank's responsibility to terminate all Counterparty Transactions under the terms of a Counterparty Swap Agreement upon an Event of Default or a Termination Event thereunder. *Upon payment by Participant of the Percentage Share of all Swap Liabilities under a Counterparty Swap Agreement to Swap Bank, Swap Bank shall be obligated to assign to Participant all of Swap Bank's rights and responsibilities under such Counterparty Swap Agreement.* After execution of the

assignment documents between Participant and Swap Bank, Swap Bank shall have no further rights or responsibilities under the Counterparty Swap Agreement and it shall be solely the right of participant to enforce any and all assigned rights under the Counterparty Swap Agreement. (emphasis added)

Because swap liabilities include any amounts owing by CLMIA to Wells Fargo, under the Swap Participation Agreement, Mercantile would be obligated to pay any monthly fee to Wells Fargo that CLMIA failed to pay. And, under the "Receipts by Swap Bank: Remittances" section of the Swap Participation Agreement upon payment of the very first monthly fee by Mercantile (i.e. swap liability), Wells Fargo was "obligated to assign to [Mercantile] all of [Wells Fargo's] rights and responsibilities under such Counterparty Swap Agreement."

While the trial court focused on the payment of the termination fee as the swap liability, it correctly noted that the payment of a swap liability by Mercantile entitled it to an assignment of rights by Wells Fargo. Mercantile thus had an adequate legal remedy, regardless of what the swap liability may have been. As such it was not entitled to equitable remedies.

Mercantile next argues that the trial court erred in interpreting the contractual provisions at issue and concluding that Mercantile's exclusive remedy was to terminate the underlying transaction. As set forth in section 4. of the Swap Participation:

It shall be Swap Bank's responsibility to terminate all Counterparty Transactions under the terms of a Counterparty Swap Agreement upon an Event of Default or a Termination Event thereunder. *Upon payment by Participant of the Percentage Share of all Swap Liabilities under a Counterparty Swap Agreement to Swap Bank, Swap Bank shall be obligated to assign to Participant all of Swap Bank's rights and responsibilities under such Counterparty Swap Agreement.* After execution of the assignment documents between Participant and Swap Bank, Swap Bank shall have no further rights or responsibilities under the Counterparty Swap Agreement and it shall be solely the right of participant to enforce any and all assigned rights under the Counterparty Swap Agreement. (emphasis added).

Mercantile is correct that it could not refuse to make a monthly payment on demand from Wells Fargo. It is incorrect that it could elect to make monthly payments until it unilaterally deemed it prudent to discontinue said payments. Under the terms of the Participation Agreement, upon payment of "all other amounts owing by such Counterparty to Swap Bank in respect of such Counterparty Transaction, in each case (i) to the extent certified by Swap Bank (whether in its demand for payment or otherwise) as not having been paid by such Counterparty when due . . . ." Wells Fargo was to assign Mercantile all of its rights and responsibilities under the swap agreement. Mercantile cannot have it both ways. If a monthly payment falls within the definition of a swap liability, as this Court agrees that it does, then the above applies. There is nothing in the Participation Agreement to indicate that Mercantile gets to stop making payments when it chooses and thus force Wells Fargo to declare a default event when Mercantile feels it is appropriate. This would leave enforcement of the terms of the swap agreement and the potential damages for which CLMIA could be liable in the hands of a party outside of the contract signed only by CLMIA and Wells Fargo.

-24-

Finally, Mercantile contends that its equitable claims against CLMIA should not have been dismissed at the pleading stage, given that it has no remedy to recover the monthly payments it made to Wells Fargo in CLMIA's stead other than through its claims of equitable subrogation, unjust enrichment, and implied contract. We disagree.

Equitable subrogation "is a legal fiction through which a person who pays a debt for which another is primarily responsible is substituted or subrogated to all the rights and remedies of the other." *Auto–Owners Ins Co v Amoco Prod Co*, 468 Mich 53, 59; 658 NW2d 460 (2003). "In order to be entitled to subrogation, a subrogee cannot voluntarily have made payment, but rather must have done so in order to fulfill a legal or equitable duty owed to the subrogor." *Ameriquest Mortgage Co v Alton*, 273 Mich App 84, 95; 731 NW2d 99 (2006)(superseded by statute on other grounds as stated in *CitiMortgage, Inc v Mortgage Electronic Registration Systems, Inc*, 295 Mich App 72; 813 NW2d 332 (2011)).

Mercantile is not and would not be entitled to equitable subrogation from CLMIA because it did not make the monthly payments to Wells Fargo in order to fulfill a legal or equitable duty owed to CLMIA as the alleged subrogor. Once payment of a single swap liability was made by Mercantile under the Participation Agreement, then Wells Fargo had the obligation to assign all of its rights under the swap agreement to Mercantile. Mercantile did not ensure that it and Wells Fargo's Participation Agreement was adhered to immediately; that is a separate issue between those two parties, not raised on appeal.

Mercantile further argues that CLMIA was unjustly enriched by Mercantile's monthly payments to Wells Fargo or that it should be entitled to recover against CLMIA based on implied contract. To sustain an action for unjust enrichment, plaintiff must "establish (1) the receipt of a benefit by the other party from the complaining party and (2) an inequity resulting to the complaining party because of the retention of the benefit by the other party." *Karaus v Bank of New York Mellon*, 300 Mich App 9, 22-23; 831 NW2d 897 (2012).

Here, CLMIA did not receive a benefit from Mercantile.[2] First and foremost, CLMIA did not receive anything from Mercantile at all-Wells Fargo did. Second, Mercantile paid Wells

---

[2] Mercantile paid funds to Wells Fargo pursuant to its Participation Agreement with Wells Fargo. Wells Fargo thus received the benefit of those payments. Mercantile paid nothing to CLMIA and CLMIA neither asked Mercantile to pay anything on its behalf to Wells Fargo nor arguably would have owed the monthly payments to Wells Fargo. Wells Fargo would not have otherwise received the monthly payments because CLMIA made it patently clear in November 2008 that it would no longer be making the monthly payments to Wells Fargo. The Wells Fargo-CLMIA Swap Agreement contained a termination provision for such an event. Had Mercantile not made more than one such payment, as it could have done under the terms of Participation Agreement, what ultimately occurred in 2010 when Mercantile did stop making the monthly payments to Wells Fargo would have happened much earlier and the default would have occurred in December 2008. Further, CLMIA is still liable for the termination fee, as it would have been in December 2008. CLMIA thus did not receive the benefit of Mercantile's voluntary monthly

Fargo a monthly fee that was purportedly due from CLMIA. However, Mercantile paid this fee for over a year. As indicated, had Mercantile paid the monthly fee one time, an event of default would have occurred and a termination fee would have been calculated. The hundreds of thousands of dollars in monthly fees that Mercantile ultimately paid and now seeks to collect from CLMIA would not have been owed to or paid to Wells Fargo by CLMIA-only a termination fee. Thus, the claim of unjust enrichment would fail in any event.

A contract will be implied only if no express contract between the same parties exists that covers the same subject matter. *Morris Pumps v Centerline Piping, Inc*, 273 Mich App 187, 194; 729 NW2d 898 (2006). Furthermore, an implied contract will be found only when there has been receipt of a benefit by one party from the other, and it would be inequitable for the party to retain such a benefit. *Id.* at 195. Again, Mercantile has not and cannot establish a benefit to CLMIA from Mercantile. Thus, no implied contract theory of recovery would succeed. In sum, Mercantile's equitable subrogation, unjust enrichment, and implied contract claims were properly dismissed.

Affirmed.

/s/ Stephen L. Borrello
/s/ Deborah A. Servitto
/s/ Douglas B. Shapiro

---

payments to Wells Fargo, which Mercantile now seeks to recoup through its unjust enrichment claim.