*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

INTEGRATED HEALTH GROUP, PC,

        Plaintiff/Counterdefendant,

and

HUSSEIN HURAIBI, M.D.,

        Plaintiff/Counterdefendant-Appellant,

v

INTEGRATED HEALTHCARE SYSTEMS, LLC,
and INTEGRATED HCS PRACTICE
MANAGEMENT, LLC,

        Defendants/Counterplaintiffs-
        Appellees,

and

EDWARD CESPEDES, VINCENT CELENTANO,
JOSEPH DESANTO, INTEGRATED HCS
IMAGING SERVICES MANAGEMENT, LLC,
BANYAN FINANCE, LLC, and BLUE RIVER
FUNDING, LLC,

        Defendants-Appellees.

UNPUBLISHED
June 24, 2021

No. 349696
Oakland Circuit Court
LC No. 2014-138231-CK

AFTER REMAND

Before: O'BRIEN, P.J., AND BECKERING AND CAMERON, JJ.

PER CURIAM.

-1-

Following plaintiff/counterdefendant Dr. Hussein Huraibi's initial appeal, we vacated the trial court's March 7, 2019 order, which dismissed the third-amended complaint and defaulted Dr. Huraibi in relation to a countercomplaint, and remanded to the trial court for further proceedings. We now affirm in part and vacate in part.

## I. BACKGROUND

In our previous opinion, we outlined the factual background of this case. *Integrated Health Group, PC v Integrated Health Care Sys*, unpublished per curiam opinion of the Court of Appeals, issued November 24, 2020 (Docket No. 349696), pp 2-3. In doing so, we indicated as follows:

> In April 2014, plaintiffs Dr. Huraibi and Integrated Health Group, PC ("IHG") filed a third amended complaint. In relevant part, the third amended complaint named Edward Cespedes, Vincent Celentano, Joseph DeSanto, Integrated HCS Imaging Services Management, LLC ("IHISM"), [Integrated Healthcare Systems, LLC ("IHCS"), and Integrated HCS Practice Management, LLC ("IHPM")] as defendants. Plaintiffs alleged several claims arising from an agreement to form a "super medical practice." As relevant to this appeal, IHCS and IHPM ("counterplaintiffs") filed a countercomplaint against Dr. Huraibi and IHG, seeking injunctive relief and an accounting, and alleging breach of the parties' contractual agreements, common-law and statutory conversion, fraud in the inducement, tortious interference with a contract, and wrongful eviction.

> Early in the proceedings, from January 2014 through July 2014, a series of highly inflammatory and harassing e-mails were sent anonymously to counterplaintiffs, to counterplaintiffs' members and agents, and to other individuals and entities with whom counterplaintiffs did business. Counterplaintiffs commenced an investigation into the source of the e-mails, which were sent from various "hushmail" e-mail accounts. Information provided by Hushmail Communications in Vancouver, British Columbia, yielded the Internet Pathway ("IP") address for the various e-mails, which together with information from various Internet Service Providers, enabled counterplaintiffs to determine the locations from which the e-mails were sent. Based on Dr. Huraibi's deposition testimony, other documentary evidence, and Dr. Huraibi's association with the various locations from which the e-mails were sent, counterplaintiffs deduced that he was the person responsible for the anonymous hushmail e-mails. In the summer of 2018, more disparaging e-mails surfaced. In particular, one e-mail that was dated August 26, 2018, disparaged counsel for counterplaintiffs and counsel's involvement in a separate lawsuit. These additional inflammatory communications prompted counterplaintiffs to move for a preliminary injunction, for an order of contempt against Dr. Huraibi, and for dismissal. Dr. Huraibi denied that he was responsible for sending the e-mails.

> Following a hearing on counterplaintiffs' motion, the trial court granted counterplaintiffs additional time to compile supporting documentation to corroborate their theory that Dr. Huraibi was responsible for the anonymous e-mails. Although counterplaintiffs submitted more than 800 pages of additional

-2-

documents in September 2018 and Dr. Huraibi filed a responsive brief, the trial court did not revisit the issue until February 2019, after the case was reassigned to a new judge. Following a motion hearing on March 6, 2019, the trial court determined that Dr. Huraibi was indeed responsible for the anonymous e-mails and had committed perjury both in his deposition and in affidavits filed with the trial court. As a result, the trial court dismissed Dr. Huraibi's third amended complaint and entered a default against him with respect to the countercomplaint. The trial court later held a bench trial, which was limited to the issue of damages. Dr. Huraibi, who was no longer represented by counsel, did not appear at the trial. At the close of proofs, the trial court awarded counterplaintiffs $67,792,227 in damages, which included exemplary damages. [*Id*. (footnote omitted).]

On appeal, Dr. Huraibi argued that the trial court abused its discretion by dismissing the third-amended complaint and by entering a default against him on the countercomplaint. After acknowledging that trial courts have inherent authority "to impose sanctions appropriate to contain and prevent abuses so as to ensure the orderly operation of justice" under *Maldonado v Ford Motor Co*, 476 Mich 372; 719 NW2d 809 (2006), this Court noted that it was not clear what authority the trial court relied upon to dismiss the third-amended complaint and to enter the default against Dr. Huraibi with respect to the countercomplaint. *Integrated Health Group*, unpub op at 3, 5. This Court opined that the type of misconduct engaged in by Dr. Huraibi "qualifies as the type of conduct for which a trial court, in the exercise of its inherent authority, would have discretion to sanction a litigant by dismissing a complaint or by entering a default." *Id*. at 6. However, because the trial court did not weigh all the relevant factors before deciding to dismiss the third-amended complaint and enter a default against Dr. Huraibi with respect to the countercomplaint, we remanded to the trial court for consideration of the factors outlined in *Vicencio v Ramirez*, 211 Mich App 501; 536 NW2d 280 (1995). *Integrated Health Group*, unpub op at 7. We retained jurisdiction. *Id*. at 9. Although Dr. Huraibi also argued that he was entitled to an evidentiary hearing on the issue of whether he had committed perjury, we concluded that Dr. Huraibi had waived the right to a hearing. *Integrated Health Group*, unpub op at 8-9.

On remand, the parties submitted briefs, and the trial court heard oral argument. Following oral argument, the trial court made a detailed ruling from the bench. After making findings of fact and weighing the factors outlined in *Vicencio*, the trial court again held that it was proper to dismiss the third-amended complaint and to enter a default against Dr. Huraibi with respect to the countercomplaint. The matter is once again before this Court.

## II. ANALYSIS

### A. ENTRY OF ORDER OF DISMISSAL AND DEFAULT FOLLOWING REMAND

As already stated, Dr. Huraibi challenges the trial court's decision to dismiss the third-amended complaint and to enter a default against Dr. Huraibi with respect to the countercomplaint. After reviewing the trial court's findings on remand, we affirm.

This Court reviews a trial court's exercise of its inherent authority for an abuse of discretion. *Baynesan v Wayne State Univ*, 316 Mich App 643, 651; 894 NW2d 102 (2016). "An abuse of discretion occurs when a court chooses an outcome outside the range of principled

outcomes." *Id*. "A trial court's factual findings are reviewed for clear error. A finding of fact is clearly erroneous when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made." *Swain v Morse*, 332 Mich App 510, 518 n 8; 957 NW2d 396 (2020) (quotation marks and citations omitted). Before dismissing a case, a trial court must weigh the following factors:

> (1) whether the violation was wilful or accidental; (2) the party's history of refusing to comply with previous court orders; (3) the prejudice to the opposing party; (4) whether there exists a history of deliberate delay; (5) the degree of compliance with other parts of the court's orders; (6) attempts to cure the defect; and (7) whether a lesser sanction would better serve the interests of justice. [*Swain*, 332 Mich App at 524, quoting *Vicencio*, 211 Mich App at 507.]

The first factor requires us to consider whether the evidence supports the trial court's finding that Dr. Huraibi committed perjury, which is inherently willful. See *People v Lively*, 470 Mich 248, 253; 680 NW2d 878 (2004) ("Our Legislature has . . . defined perjury as a willfully false statement regarding any matter or thing, if an oath is authorized or required."). Record evidence establishes that e-mails from January 3, 2014 to March 24, 2014 were sent from various accounts in which Dr. Huraibi's e-mail address was blind copied. Several e-mails that were sent in 2014 were linked to an IP address that is associated with Dr. Huraibi's businesses. Several e-mails were also sent from an IP address associated with the Canton Public Library, to which Dr. Huraibi agreed that he had access. Evidence also supported that several e-mails were sent from a cell phone that was associated with Dr. Huraibi.

Even more specific evidence was presented concerning Dr. Huraibi's involvement in the e-mails. On June 5, 2014, activity related to the e-mail address we.care.360@hushmail.com was conducted from an IP address that was linked to a Panera Bread restaurant in Lathrup Village, Michigan. A short period of time after an inflammatory e-mail was sent from the hushmail e-mail address, Dr. Huraibi sent an e-mail to a family member from his personal e-mail account, which indicated that Dr. Huraibi was at Panera Bread. In early July 2014, several e-mails were sent from an IP address that was identified as belonging to Dr. Huraibi's brother-in-law, who lived in Colorado. The e-mails were sent using the hushmail e-mail address integrated.healthcare.systems.llc@hushmail.com, and Dr. Huraibi admitted that he had visited his brother-in-law at his home in Colorado during that time and that he had access to his brother-in-law's Wi-Fi. While Dr. Huraibi would later blame his former assistant for sending the e-mails, Dr. Huraibi admitted that his former assistant did not accompany him to Colorado in July 2014.

In response to interrogatories, on March 7, 2014, Dr. Huraibi identified two e-mail accounts that he had maintained since January 1, 2013. Those e-mail accounts were not related to the hushmail accounts. After counterplaintiffs accused Dr. Huraibi of sending the inflammatory e-mails from the hushmail accounts in a motion, Dr. Huraibi executed an affidavit. The July 14, 2014 affidavit provided as follows:

> 8.    I am . . . not the author or owner of the email messages and addresses referenced in [counterplaintiffs'] motion. I have no idea who is sending these emails. Given Defendants' numerous fraudulent business activities, and the

number of people they have harmed, there is any number of potential candidates who are motivated to send the emails.

> 9.     [Counterplaintiffs'] suggestion that I have been stalking or harassing former employees of [IHCS] is false.   My email communications with these individuals have been appropriate and above board . . . .

On July 23, 2014, the trial court entered an order, which required a representative from Hush Communications Canada, Inc., to provide the "IP address/addresses and all other identifying information associated with the sender of" certain e-mails that were sent from certain hushmail addresses.  In September 2014, the trial court entered another order, which outlined the procedure that would be used by forensic technicians when they examined the parties' e-mail accounts.  It appears that, because Dr. Huraibi did not disclose his use of the hushmail accounts in response to discovery, those e-mail accounts were not examined.

According to Dr. Huraibi, he discovered in October 2014 that his former assistant had sent "some" of the anonymous e-mails.  In requests for admission that were dated December 5, 2014, Dr. Huraibi denied that either he or someone on his behalf created the hushmail e-mail addresses and sent certain e-mails.  Dr. Huraibi did not publicly indicate that his former assistant had confessed to sending the e-mails until he submitted an affidavit from his former assistant in January 2015 in response to a motion for summary disposition that was filed by counterplaintiffs.  In the affidavit, Dr. Huraibi's former assistant indicated that she "was the author of the anonymous Hushmail emails that [counterplaintiffs had] identified" and that she had sent the e-mails without Dr. Huraibi's knowledge.  The former assistant did not purport to explain how she could have sent the e-mails that were associated with Dr. Huraibi's brother-in-law's IP address in Colorado.  During a June 2015 deposition, Dr. Huraibi denied involvement with the inflammatory e-mails and, in a September 21, 2018 affidavit, he denied that he had misrepresented information during the proceeding.

After reviewing all of the evidence and after Dr. Huraibi waived his right to an evidentiary hearing on the issue of perjury, the trial court found as follows at the March 2019 hearing:

> I find it, you know, a little disingenuous that the—the plaintiff is indicating that he was not the source of the emails.  And I think the most telling part of it is the one that was done from Colorado, as [Dr. Huraibi's former assistant] was not in Colorado, or she would not have access to Dr. Huraibi's brother-in-law's wifi connection to be able to have sent those emails.

> So, even if I was to disregard all the other evidence that was proffered here, certainly, the emails from that particular juncture in July definitely were done by the plaintiff in this matter.  Which leads me to the belief that he was also responsible for all the other emails that were sent.  And so I do feel he has perjured himself in the sense that he's made more than one statement, either in an affidavit or under oath, that he was not the person responsible.

As to the remedy for such action, the defendants are requesting dismissal of his—of his complaint and a default on his—on the counterclaims. In considering the length and the extent and degree that the plaintiff went to in promoting this agenda to vilify and cast aspersions, whether they are true or not is not the issue, but the fact that that was done does require a significant sanction.

When considering the first factor on remand, the trial court referenced its March 2019 findings, highlighting "the extraordinary" "length and the extent and the degree that [Dr. Huraibi] went to in promoting his agenda of vilifying the Counter-Plaintiffs and their agents . . . [and] their members[.]" Given this evidence, we cannot say that the trial court clearly erred by finding that Dr. Huraibi committed perjury by repeatedly denying that he played any role in the inflammatory e-mails. Because Dr. Huraibi's conduct was intentional, the first factor weighs in favor of dismissal and entry of default.

With respect to the second factor, i.e., Dr. Huraibi's history of refusing to comply with previous court orders, both the trial court and counterplaintiffs rely on Dr. Huraibi's alleged violation of the trial court's September 2014 order. However, that order did not explicitly require Dr. Huraibi to disclose all the e-mail accounts that he maintained or utilized. Rather, the order outlined the process that would be utilized by forensic technicians when they performed searches on the e-mail accounts used and maintained by certain individuals, including Dr. Huraibi. There is no indication that Dr. Huraibi impeded this process. Consequently, the trial court clearly erred by finding that Dr. Huraibi had violated the September 2014 order and by finding that this factor weighs in favor of dismissal and entry of default. Because there is no indication that Dr. Huraibi violated any court orders, factor five also weighs against dismissal and entry of default.

With respect to the third factor, in *Swain*, 332 Mich App at 527-528, this Court considered whether the subject of the plaintiff's false deposition testimony related to the plaintiff's "prima facie case" or simply "related to an ancillary matter" when determining whether the defendant was "substantially prejudiced by [the] plaintiff's [false deposition] testimony." In this case, counterplaintiffs' countercomplaint contained claims for injunctive relief, for an accounting, for breach of the parties' contractual agreements, for common-law and statutory conversion, for fraud in the inducement, for tortious interference with a contract, and for wrongful eviction.

Although the breach of contract claim[1] and the tortious interference with a contract claim alleged that Dr. Huraibi was disparaging counterplaintiffs to others, the countercomplaint did not

---

[1] The relevant portion of one of the contracts provides as follows:

At all times during the term of this Agreement and following its expiration or termination for any reason, the parties and Company Principals agree to not, directly or indirectly, in public or private, whether in oral, written, electronic or other format, disparage, deprecate, impugn or otherwise make any statements or remarks that would tend to or be construed to defame or slander the personal or professional reputations, professional qualifications, services and/or business of the other party, its owner(s), affiliates and/or its/his/her/their independent contractors,

reference the 2014 e-mails. Nonetheless, discovery was sought in relation to the e-mails as early as 2014, and the parties carried on as though Dr. Huraibi's actions with respect to the e-mails was part of counterplaintiffs' claim. Indeed, at the bench trial, DeSanto testified in detail about how he and others were damaged by the e-mails. Dr. Huraibi did not object to the issue at the bench trial. In fact, Dr. Huraibi did not even appear. Dr. Huraibi also acknowledged on remand that the "harassing . . . emails were subject of litigation in [counterplaintiffs'] pled claims." Thus, Dr. Huraibi's conduct in relation to the e-mails was part of counterplaintiffs' prima facie case of breach of contract and tortious interference with a contract.[2] We therefore agree with the trial court that Dr. Huraibi's conduct interfered with counterplaintiffs' ability "to properly prove their case." This factor therefore weighs in favor of dismissal and entry of default.

We also conclude that the fourth and sixth factor, i.e., whether there exists a history of deliberate delay and whether there was an attempt to cure the misrepresentations, weigh in favor of dismissal and entry of default. Review of the record establishes that the proceedings were delayed by Dr. Huraibi's refusal to admit his part in the inflammatory e-mails and his failure to be forthcoming in discovery responses. As noted by the trial court, counterplaintiffs were forced to engage in extensive investigation to uncover Dr. Huraibi's role. Even then, Dr. Huraibi continued to deny his role in the inflammatory e-mail campaign and tried to incriminate his former assistant. Dr. Huraibi did so even though the evidence established that his assistant could not have sent certain e-mails because she was not with Dr. Huraibi in Colorado in July 2014. As a result of this, counterplaintiffs sought entry of default and dismissal, which required drafting a motion, compiling hundreds of pages of discovery, and participating in motion hearings.

With respect to whether a lesser sanction would have better served the interests of justice, for the reasons already discussed, we agree with the trial court that Dr. Huraibi's actions threaten the integrity of the judicial process. Dr. Huraibi perjured himself on multiple occasions, and he flagrantly refused to facilitate discovery with respect to the e-mails. Evidence also supports that Dr. Huraibi resurrected the e-mail campaign in 2018, thereby demonstrating Dr. Huraibi's blatant disregard for the integrity of our judicial system. As stated by the trial court, such conduct cannot be tolerated. Because the hallmarks of the type of misconduct warranting dismissal are present in this case, the trial court properly determined that the interests of justice would not have been better served by a lesser sanction. Indeed, we cannot fathom what other sanction would have the necessary deterrent effect. Given the nature of Dr. Huraibi's actions and because a majority of the factors weigh in favor of dismissal and entry of default, the trial court did not abuse its discretion.

---

employees, agents and/or successors, nor shall such party in any manner assist or encourage any third party in doing so.

[2] Although the countercomplaint was never amended to include allegations relating to the e-mails, the trial court would have had discretion under MCR 2.118(C)(1) to permit amendment of the countercomplaint had such a motion been made. See also *Zdrojewski v Murphy*, 254 Mich App 50, 61; 657 NW2d 721 (2002) (holding that the "defendants' failure to object to the admission of res ipsa loquitur evidence implied their consent to litigate the issue").

## B.  EXEMPLARY DAMAGES

Next, Dr. Huraibi makes several arguments concerning the trial court's decision to award exemplary damages.  Because none of these arguments are preserved, we review for plain error. See *Gen Motors Corp v Dep't of Treasury*, 290 Mich App 355, 386; 803 NW2d 698 (2010).  "To avoid forfeiture under the plain error rule, three requirements must be met: 1) the error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights."  *Kern v Blethen-Coluni*, 240 Mich App 333, 336; 612 NW2d 838 (2000) (quotation marks and citation omitted).

Dr. Huraibi first argues that the trial court erred by awarding exemplary damages given that counterplaintiffs failed to specifically plead such a claim.  Exemplary damages must be specifically pled.  *Law Offices of Lawrence J Stockler, PC v Rose*, 174 Mich App 14, 45; 436 NW2d 70 (1989).  "[E]xemplary damages are permissible in both legal and equitable actions where the plaintiff pleads malicious and wilful conduct."  *McPeak v McPeak* (*On Remand*), 233 Mich App 483, 489; 593 NW2d 180 (1999).  "The purpose of exemplary damages is to make the injured party whole," *Unibar Maintenance Servs, Inc v Saigh*, 283 Mich App 609, 630; 769 NW2d 911 (2009), as opposed to punish, *Kewin v Massachusetts Mut Life Ins Co*, 409 Mich 401, 419; 295 NW2d 50 (1980).  Indeed,

> [e]xemplary damages are a class of compensatory damages that allow for compensation for injury to feelings.  In order to justify an award of exemplary damages, the act or conduct complained of must be voluntary and the act must inspire feelings of humiliation, outrage, and indignity.  The act or conduct must also be malicious or so wilful and wanton as to demonstrate a reckless disregard of [the] plaintiff's rights.  The theory is that the reprehensibility of the defendant's conduct both intensifies the injury and justifies the award of exemplary damages as compensation for the harm done [to] the plaintiff's feelings.  [*McPeak* (*On Remand*), 233 Mich App at 487-488 (citations omitted).]

Counterplaintiffs in this case alleged in their countercomplaint that Dr. Huraibi engaged in willful and malicious conduct, particularly with regard to the disparagement of their reputations and Dr. Huraibi's seemingly abrupt decision to maliciously decimate the business relationship, as well as the business itself.  Counterplaintiffs also alleged that Dr. Huraibi intentionally misled others regarding the financial status of Dr. Huraibi's business in order to entice counterplaintiffs to enter into business with him.  Thus, counterplaintiffs pleaded allegations to support that Dr. Huraibi's willful conduct inspired "feelings of humiliation, outrage, and indignity."  See *id*. at 487.  Such injuries to feelings would naturally flow from Dr. Huraibi's acts, especially when considering the nature of his conduct.  Cf. *Rose*, 174 Mich App at 45.

Additionally, counterplaintiffs requested exemplary damages in the proposed final pretrial order and submitted proposed jury instructions relating to exemplary damages.  A copy of the proposed final pretrial order was provided to Dr. Huraibi, but he did not participate in finalizing that order in circumvention of the trial court's directive.  Additionally, Dr. Huraibi did not appear at the trial, much less object to counterplaintiffs' request for exemplary damages.  We therefore conclude that the trial court did not plainly err in this respect.

Next, Dr. Huraibi argues that the trial court erred by awarding exemplary damages because they were not recoverable in this action, which concerns commercial contracts. "In Michigan, the general rule is that exemplary damages are not available in an action for breach of a commercial contract. An exception exists where there is proof of tortious conduct independent of the breach." *Sullivan Indus, Inc v Double Seal Glass Co, Inc*, 192 Mich App 333, 351; 480 NW2d 623 (1991). The rationale underlying the general rule that exemplary damages are not recoverable in the context of a commercial contract is as follows:

> Just as with that denying damages for mental distress, the theory underlying the denial of exemplary damages in breach of contract cases is that the plaintiff is adequately compensated when damages are awarded by reference only to the terms of the contract. [*Kewin*, 409 Mich at 420.]

Therefore, "absent allegation and proof of tortious conduct existing independent of the breach, . . . exemplary damages may not be awarded in common-law actions brought for breach of a commercial contract." *Id*. at 420-421.

The trial court awarded exemplary damages as follows: (1) fraud in the inducement, $1,000,000; (2) breach of contract, $16,000,000; (3) wrongful eviction, $1,000,000; and (4) tortious interference with a contract, $2,000,000. "[T]ortious interference with a contract is an intentional tort." *Knight Enterprises v RPF Oil Co*, 299 Mich App 275, 280; 829 NW2d 345 (2013). "[T]he conduct [that appellate courts] have found sufficient to justify the award of exemplary damages has occurred in the context of the intentional torts, slander, libel, deceit, seduction, and other intentional (but malicious) acts." *Veselenak v Smith*, 414 Mich 567, 575; 327 NW 261 (1982). See also *McPeak (On Remand)*, 233 Mich App at 488. Although the facts that give rise to the tortious interference with a contract claim overlap with some of the facts that give rise to the breach of contract claim, this does not render the trial court's award of exemplary damages in relation to the tortious interference with a contract claim erroneous as a matter of law. Indeed, although the parties' contract prohibited Dr. Huraibi from disparaging counterplaintiffs and others who are associated with counterplaintiffs, a claim of tortious interference with a contract requires a plaintiff to prove more than just disparagement. See *Knight Enterprises*, 299 Mich App at 280 (outlining the elements of tortious interference with a contract). Therefore, the tortious interference with a contract claim required additional, independent facts that were not connected to the breach of contract claim. Because counterplaintiffs showed that Dr. Huraibi committed an independent tort that is separate and distinct from the breach of contract claim, we conclude that Dr. Huraibi has failed to establish plain error in this respect. *Phillips v Butterball Farms Co, Inc*, 448 Mich 239, 251; 531 NW2d 144 (1995) ("Because this action sounds in tort, the available damages are not limited by contract principles.") (quotation marks and citation omitted.)

Counterplaintiffs' fraud in the inducement claim is also recognized as an intentional tort. *Huron Tool & Engineering Co v Precision Consulting Servs, Inc*, 209 Mich App 365, 368; 532 NW2d 541 (1995). More importantly, the fraud claim arose from Dr. Huraibi's actions *before* the parties entered into the commercial contract. Specifically, counterplaintiffs alleged that Dr. Huraibi made certain misrepresentations in an effort to entice counterplaintiffs to enter into business with him. Therefore, because the fraud claim is independent from the breach of contract claim, the trial court did not plainly err by awarding exemplary damages in relation to that claim.

The wrongful eviction claim alleged that Dr. Huraibi locked counterplaintiffs' representatives and agents out of the medical building in Southfield without following proper legal procedures.[3] Thus, because this claim did not sound in breach of contract and instead alleged that the manner in which the eviction was carried out was illegal, counterplaintiffs were only required to prove that Dr. Huraibi willfully acted in such a way as to "inspire feelings of humiliation, outrage, and indignity." *McPeak (On Remand)*, 233 Mich App at 487. Because Dr. Huraibi does not allege that counterplaintiffs failed to do so, we conclude that the trial court did not plainly err by awarding exemplary damages in relation to the wrongful eviction claim.

With respect to the breach of contract claim, counterplaintiffs alleged that Dr. Huraibi breached the terms of the agreement by not following the agreed procedure for withdrawing from the parties' business arrangement, by disparaging counterplaintiffs and others associated with them to other entities, by diverting assets without approval, and by preventing counterplaintiffs and their agents from performing their duties under the contracts. Counterplaintiffs did not allege any tortious conduct that existed independent from these claims. Indeed, Dr. Huraibi's obligation to take certain actions when dissolving the business relationships, to not disparage counterplaintiffs,[4] to not divert funds,[5] and to not inhibit any of the contracting parties from carrying out their contractual duties arose exclusively from the contracts. Because counterplaintiffs did not allege facts independent of the breach of contract in relation to the breach of contract claim, the trial court plainly erred by awarding $16 million in exemplary damages. Consequently, because exemplary damages were not recoverable with respect to the breach of contract claim, it reasonably follows that the trial court plainly erred by awarding $2,610,835 in prejudgment interest with respect to the $16 million in exemplary damages. It is indisputable that the trial court's error prejudiced Dr. Huraibi because the errors resulted in a substantial judgment being entered against him. We therefore vacate those portions of the June 18, 2019 judgment.

## III. CONCLUSION

We affirm the trial court's decision to dismiss Dr. Huraibi's third-amended complaint and to enter default on the countercomplaint in favor of counterplaintiffs. With respect to the June 18, 2019 judgment, we vacate the portions of the judgment that awarded $16 million dollars to

---

[3] Dr. Huraibi co-owned the building.

[4] While counterplaintiffs alleged at certain points during the proceeding that Dr. Huraibi's e-mails amounted to defamation, counterplaintiffs did not plead a claim of defamation and did not establish that the information contained in the e-mails was false. See *Smith v Anonymous Joint Enterprise*, 487 Mich 102, 113; 793 NW2d 533 (2010) (noting that, to establish a claim of defamation, a plaintiff must establish that there was "a false and defamatory statement concerning the plaintiff"). The trial court did not make a finding that the information contained in the e-mails was false given that it was not necessary to whether Dr. Huraibi had engaged in perjury. Indeed, the trial court specifically indicated that whether the "aspersions" cast by Dr. Huraibi were "true or not [was] not the issue[.]"

[5] On July 1, 2015, the trial court dismissed counterplaintiffs' common-law and statutory conversion claims with prejudice.

counterplaintiffs as exemplary damages in relation to the breach of contract claim and the portion of the judgment that awarded counterplaintiffs $2,610,835 in prejudgment interest.

/s/ Colleen A. O'Brien
/s/ Jane M. Beckering
/s/ Thomas C. Cameron